189 N.J. Super. 549 (1983)
461 A.2d 178
ATLANTIC CITY RACING ASSOCIATION, A NEW JERSEY CORPORATION, PLAINTIFF,
v.
THE ATTORNEY GENERAL OF THE STATE OF NEW JERSEY; THE NEW JERSEY SPORTS & EXPOSITION AUTHORITY; AND THE NEW JERSEY RACING COMMISSION, DEFENDANTS.
Superior Court of New Jersey, Law Division Atlantic County.
March 28, 1983.
*551 David M. Satz, Jr., for plaintiff (Saiber, Schlesinger, Satz & Goldstein, attorneys; David M. Satz, Jr., and Steven S. Goldenberg, on the brief).
*552 Joseph A. Rizzi, for defendant New Jersey Sports & Exposition Authority (Winnie, Banta & Rizzi, attorneys; Andrew P. Napolitano, on the brief).
Andrea M. Silkowitz, Deputy Attorney General, for defendant Attorney General of the State of New Jersey (Irwin I. Kimmelman, Attorney General of New Jersey, attorney).
GRUCCIO, A.J.S.C.
This case is before the court on cross-motions for summary judgment. Plaintiff instituted this action under N.J.S.A. 2A:16-50 et seq. seeking a judgment declaring that an arrangement proposed by plaintiff, under which horse races conducted by New Jersey Sports & Exposition Authority at its state-licensed racetrack, the Meadowlands, would be simulcast live via television operations to plaintiff's licensed race course, Atlantic City Race Course (ACRC), for the purposes of allowing plaintiff's patrons at ACRC to place parimutuel system wagers upon those races and to incorporate those wagers into a central parimutuel pool at the "sending track," would be permissible under N.J. Const. (1947) Art. IV, § VII, par. 2. Alternatively, plaintiff seeks an order approving a plan whereby, under the existing statutory framework, defendant New Jersey Sports & Exposition Authority would lease plaintiff's facilities and simulcast Meadowlands races to ACRC, allowing plaintiff's patrons to place wagers on those races. This latter proposal has been referred to as the "extended Meadowlands" concept. Named as defendants in this matter are the Attorney General of New Jersey, the New Jersey Sports & Exposition Authority (SA) and the New Jersey Racing Commission. Defendant SA has filed a crossclaim against the other defendants and joins in plaintiff's application for declaratory relief. Defendant Racing Commission is bound by law to follow the legal advice of the Attorney General. N.J.S.A. 52:17A-4. The Attorney General's present position, consistent with letter opinions dated July 15, 1982 and August 4, 1982, is that the simulcasting proposals submitted by plaintiff are prohibited under both his interpretation of N.J. *553 Const. (1947), Art. IV, § VII, par. 2 and statutes promulgated thereunder.

A
Initially, it appears without question that existing statutes promulgated by the Legislature to put into effect the parimutuel system of wagering on horse races as authorized by the 1939 constitutional amendment clearly bar the proposals contemplated by plaintiff. N.J.S.A. 5:5-62[1] and 5:5-63,[2] when *554 read both separately and jointly, unequivocally restrict parimutuel wagering on races to that track where the particular race is held. Given the clarity of these provisions, plaintiff's alternative "extended Meadowlands" concept cannot be sanctioned by this court under present law, as to do so would allow plaintiff to do indirectly what it clearly cannot do directly. While plaintiff and defendant SA do not expressly seek a ruling declaring N.J.S.A. 5:5-62 and N.J.S.A. 5:5-63 invalid, each party does offer arguments as to why any bar to plaintiff's proposal, be it statutory or constitutional, should be set aside to permit the proposal. The court will briefly address the validity of N.J.S.A. 5:5-62 and N.J.S.A. 5:5-63 in light of the indirect attacks on those provisions.
Plaintiff, citing the spread of competition from racetracks both within and without the state and severe adverse economic conditions which have resulted in plaintiff's track being operated at losses of millions of dollars since 1975, asserts that the approval of its simulcast proposal is vital to ACRC's continued existence. Plaintiff states that the closing of ACRC would have a substantial negative impact on such beneficial public purposes as the promotion of the State's racing industry and in-state breeding programs, and employment at the track and the surrounding area. On the other hand, plaintiff continues, the approval of its proposed plan and consequent revitalization of ACRC would benefit the State by promoting tourism in southern New Jersey and by increasing state revenues. The bleak economic picture painted by plaintiff is not insignificant. However, such economic hardship is clearly insufficient grounds for setting aside presumptively valid legislation, which was enacted pursuant to a specific constitutional grant of authority and which restricts parimutuel wagering to the track where the race is run. It is for the Legislature, the branch of government *555 closest to the people, to correct any economic hardship in a specific area where the Legislature deems such action appropriate. This is especially so in the present case in light of the clear and longstanding policy of New Jersey courts to accord great deference to the gambling statutes of this State. See State v. Puryear, 52 N.J. 81 (1968).
In a separate challenge to the validity of N.J.S.A. 5:5-62 and N.J.S.A. 5:5-63, defendant SA submits that the exercise of any statutory or regulatory authority by the State in purporting to prohibit plaintiff's proposed simulcasting arrangement is pre-empted by federal legislation regulating interstate communications (via the Communications Act of 1934, 47 U.S.C.A. § 151 et seq.) and the Federal Interstate Horseracing Act of 1978 (15 U.S.C.A. § 3001 et seq.).
The court has fully considered the pre-emption argument and finds it to be without merit for the following reasons. It is established law that the pre-emption doctrine will not be invoked unless the federal law is explicitly or implicitly intended to prohibit state regulation in the field, or it appears that an actual conflict exists between the operation of federal and state laws. See, e.g., Ray v. Atlantic Richfield Co., 435 U.S. 151, 157-158, 98 S.Ct. 988, 994-995, 55 L.Ed.2d 179 (1978); McGlynn v. N.J. Public Broadcast. Auth., 88 N.J. 112, 137 (1981). In the present case, neither such an ouster of state authority nor a conflict is apparent. There can be no question that Congress, by the enactment of the above-cited federal laws or any other laws, did not intend to preclude state regulation of the manner and method by which gambling on horse races may be permitted within a state. Clearly this area is a matter of local interest subject to the police and regulatory powers of the states under the Tenth Amendment of the U.S. Constitution. Indeed, the Interstate Horseracing Act itself provides:
The States should have the primary responsibility for determining what forms of gambling may legally take place within their borders. [15 U.S.C.A. 3001(a)(1)]
*556 It is equally apparent that no conflict exists between the exercise of federal and state powers in the present case. First, it should be made clear that the position of the Attorney General does not flatly prohibit the transmittal of televised horse races through interstate facilities. Rather, the State's position with respect to simulcasting communications applies only to the manner and mode of gambling on the races being broadcast, and not on the broadcasting itself. Secondly, a close reading of the Interstate Horseracing Act reveals that the off-track betting which the act is directed toward must meet the prerequisite of validity under state law. See 15 U.S.C.A. § 3001(a)(1), supra; 15 U.S.C.A. § 3004(a) (requiring joint consent as to off-track wagers from the horse racing commission, or, in the present case, defendant Racing Commission). Since the required joint consent and legality under state law are not met here, the Interstate Horseracing Act, although having a stated purpose of furthering legal off-track betting industries, by its own terms does not apply. In sum, the court finds that the State's authority to regulate racing under N.J.S.A. 5:5-62 and N.J.S.A. 5:5-63 is not pre-empted by federal legislation.

B
The remaining issue before the court in this action is whether the proposals of plaintiff are prohibited by the New Jersey Constitution as well as by the statutory framework as set forth in Part A of this opinion. The relevant constitutional provision, a 1939 amendment to Art. IV, § VII, par. 2 of the 1844 Constitution as incorporated by reference into the 1947 Constitution, reads as follows:
It shall be lawful to hold, carry on, and operate in this State race meetings whereat the trotting, running or steeplechase racing of horses only may be conducted between the hours of sunrise and sunset on weekdays only and in duly-legalized racetracks, at which the pari-mutuel system of betting shall be permitted. No lottery, roulette or game of chance of any form shall be authorized by the Legislature in this State, and no ticket in any lottery shall be bought or sold within this State, or offered for sale; nor shall pool-selling, book-making, or gambling of any kind be authorized or allowed within this State, except pari-mutuel betting on the results of the racing of horses only, *557 from which the State shall derive a reasonable revenue for the support of government; nor shall any gambling device, practice, or game of chance, or pari-mutuel betting thereon now prohibited by law, except as hereinstated and otherwise provided, be legalized, or the remedy, penalty, or punishment now provided therefor be in any way diminished.
In support of his position that this 1939 Amendment should be interpreted to bar plaintiff's proposals, the Attorney General correctly cites the long-standing general policy of New Jersey courts to interpret narrowly provisions authorizing forms of gaming and to refrain from extending such provisions beyond their normal and common usage. See Karafa v. N.J. State Lottery Comm'n, 129 N.J. Super. 499 (Ch.Div. 1974). Indeed, New Jersey's comprehensive policy against all forms of gambling (except where specifically authorized by the people) has been clear and longstanding, see Carll & Ramagosa, Inc. v. Ash, 23 N.J. 436, 445 (1957), and this principle remains inviolate to this day. For example, in a case recently before this court involving a proposed entry-fee backgammon tournament, it was determined that the game of backgammon played for stakes falls within the definition of gambling consistently applied under our Constitution; accordingly, the proposed entry-fee tournament would be illegal since this particular activity, i.e., backgammon, was not a form of gambling that had been specifically authorized by the people. See Boardwalk Regency Corp. v. Attorney General, 188 N.J. Super. 372 (Law Div. 1982).
Also instructive in this inquiry is the recent case of IGP-East, Inc. v. Gaming Enforcement Div., 182 N.J. Super. 562 (App.Div. 1982), where the court held that the Casino Control Commission's authorization of an entry-fee craps tournament as an "authorized gambling game" under the Casino Control Act was reasonable and that the conduct of the tournament was not an illegal gambling scheme under the state criminal statutes. The court notes that in both of the above cases the critical underlying factors were (1) whether the proposed activity was a form of gambling specifically authorized by the people, and (2), if so, whether the New Jersey Legislature and appropriate bodies were in a position to maintain the type of control over the *558 activity within the boundaries of this State as contemplated by the relevant Constitutional grant of authority. Thus, it is clear that any proposal that contemplates wagering on racing activities held outside of New Jersey and beyond the direct reach of the New Jersey enforcement agencies would be illegal since no state constitutional enactment has authorized any such interstate gambling scheme.
In the present case it is noted initially that a constitutional enactment has clearly and specifically authorized the operation of horse races at state licensed racetracks and the wagering on the races held at those tracks. Secondly, the court notes that, contrary to the assertions of the Attorney General, the precise words used in the subject constitutional amendment do not, by their ordinary meaning or usage foreclose the arrangement proposed by plaintiff. The words "at which" plainly modify the plural term "racetracks", and plaintiff's proposal contemplates the placing of wagers at duly-licensed racetracks on races run in New Jersey's authorized racetracks. Thus the court finds that, under the plain language of the constitutional provision, the subject proposal of plaintiff is not prohibited but rather would be a variation of a particular form of gambling specifically authorized by the people. See IGP-East, Inc., supra. It would appear that the regulatory control of racing which the Constitution authorizes and contemplates would have the same, full force and effect with regard to the scheme proposed by plaintiff as such control is exercised currently over present operations.
The court does find that the Legislature, in the exercise of its proper discretion under the constitutional grant of authority, in enacting N.J.S.A. 5:5-62 and N.J.S.A. 5:5-63 has validly elected to clearly delineate that such betting shall be limited to the particular track where the race is being held. See Part A of this opinion. The Attorney General asserts that this legislation itself reinforces its position that the constitutional provision was intended to be equally as restrictive as are the statutes. The court, while recognizing the authority of the Legislature to regulate horse race gambling as it has, must reject the argument *559 that such legislation articulates completely the intent behind the 1939 amendment. To make this assumption under these circumstances would improperly accord constitutional significance to an act of the Legislature. See Virtue v. Essex Freeholders, 67 N.J.L. 139 (Sup.Ct. 1901). Rather, the Legislature's actions must be viewed as constituting a permissible alternative under the constitutional grant of authority to regulate racetrack betting, and nothing more. The case of IGP-East, Inc., supra, is illustrative on this point. In rejecting the Attorney General's argument in that case that the criminal code prohibited a proposed entry-fee craps tournament approved by the Casino Control Commission, the IGP-East court found that the Legislature did not intend that the new Criminal Code was to supersede or prohibit any activity authorized under the constitutionally-sanctioned Casino Control Act. Id. at 566-567. While the present case clearly does not involve the Casino Control Act, a similar principle, namely, that the Legislature in enacting N.J.S.A. 5:5-62 and N.J.S.A. 5:5-63 could not have intended to supersede or prohibit absolutely that which was authorized by the Constitution, must apply.
Leaving aside for the moment the plain language and the subsequent acts of the Legislature, there appears to be nothing of consequence in the history behind the enactment of this constitutional provision which would shed meaningful light on the particular issue before the court. It would, in fact, appear that the technology underlying the simulcasting arrangement proposed by plaintiff was neither contemplated nor foreseen by the drafters at the time the amendment was passed.
Thus, the court is faced with interpreting a constitutional provision as it applies to a situation presented by modern circumstances not anticipated when the relevant section was drafted. As stated in Euclid v. Amber Realty Co., 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926), constitutional provisions must be expanded or contracted to meet the new and different conditions which are constantly coming within the field of their operation. Upon review and full consideration of all facts and *560 circumstances and principles involved, the court finds that plaintiff's proposal would be within the ambit of the New Jersey Constitution, which by its plain language is less restrictive than the statutes currently in effect. Under proper supervision and control by legislative and administrative authorities, the policies and purposes underlying Art. IV, § VII, par. 2, would be preserved, and not defeated, by the operation of racehorse gambling in accordance with plaintiff's proposal. The Constitution's mandate that parimutuel wagering be limited to a duly-licensed racetrack, an obvious prohibition against off-track betting, is not violated by the subject arrangement. The court finds that the arrangement does not envision off-track betting within the generally accepted definition of that term. In fact, the contemplated implementation of wagering on in-state races shown on television screens at plaintiff's racetrack is not a great deal different than existing operations which allow patrons to bet on races from the track which are seen on television screens in other areas on the track grounds, such as restaurants, where there is no direct view of the racetrack.
In sum, the court finds that the proposed arrangement of plaintiff, while not permitted under existing statutes, falls within the external boundaries of the New Jersey Constitution, and would be acceptable if, and only if, such a proposal received legislative and regulatory sanction from the appropriate bodies authorized to put into effect the permitted forms of horse race wagering in New Jersey. The court notes that nothing in this opinion shall be construed as constitutional sanction of any proposals involving the wagering by in-state racetrack patrons on horse races conducted out-of-state and transmitted via simulcast to in-state race courses. Such a proposal would present patent state constitutional problems in that those races are not subject to the licensing and regulatory requirements of New Jersey authorities, and to permit wagering on such races would clearly constitute a form of gambling not heretofore authorized and therefore prohibited under N.J. Const. (1947) Art. IV, § VII, par. 2. Finally, the feasibility of plaintiff's intra-state *561 proposal and particular problems which may arise in implementing same are not before this court and are appropriate subjects for the legislature and the state racing commission, if and when those bodies decide to address this situation.
NOTES
[1] N.J.S.A. 5:5-62 states:

Any permit holder conducting a horse race meeting under this act may provide a place or places in the race meeting grounds or enclosure at which such holder of a permit may conduct and supervise the pari-mutuel system of wagering by patrons on the result of the horse races conducted by such permit holder at such meeting, and such pari-mutuel system of wagering upon the result of such horse races held at such horse race meeting and within such race track and at such horse race meeting shall not under any circumstances, if conducted under the provisions of this act and in conformity thereto, be held or construed to be unlawful, other statutes of the State of New Jersey to the contrary notwithstanding. Such place or places so provided in conformity with this section shall be equipped with such automatic ticket issuing and vending machines and with adding machine equipment capable of accurate and speedy determination of the amount of money in each pool and on each horse and the amount of award or dividend to winning patrons and displaying the same to the patrons. Such machine shall further be equipped with automatic or hand operated machinery suitable for displaying on the mutuel board across the track, in plain view of the public, the total amount of sales on each and every race and the amount of award or dividend to winning patrons.
[2] N.J.S.A. 5:5-63 states:

The machine, or mutuel board, is also to display the approximate odds on each horse in any race; the value of a $2.00 mutuel ticket, straight, place and show, on the first three horses in any race; the elapsed time of the race; the value of a $2.00 daily double ticket, if conducted, and any other information that may be necessary for the guidance of the general public. Any such machine must be approved by the commission before it may be used, and to prevent a monopoly in the use of any particular machine or type thereof the commission may in its discretion approve the use of any other machine. No other place or method of betting, pool making, wagering or gambling shall be used or permitted by the holder of a permit, nor shall the pari-mutuel system of wagering be conducted on any races except horse races at the race track where such pari-mutuel system of wagering is conducted.