KENTUCKY DIVISION, HORSEMEN'S BENEVOLENT & PROTECTIVE ASSOCIATION, INC., et al., Plaintiffs,

v.

TURFWAY PARK RACING, et al., Defendants.

Civ. A. No. 92–199.

United States District Court, E.D. Kentucky, Covington Division.

Sept. 20, 1993.

**1098**

Douglas L. McSwain, Sturgill, Turner & Truitt, Lexington, KY, for Kentucky Div., Horsemen's Benevolent & Protective Ass'n, Inc.

William M. Lear, Jr., Stoll, Keenon & Park, Lexington, KY, for Kentucky Thoroughbred Ass'n, Inc.

Charles Deters, Thomas Bosse, Deters, Benzinger & Lavelle, Covington, KY, for Turfway Park Racing Ass'n, Inc.

Charles Deters, Thomas Bosse, Deters, Benzinger & Lavelle, Covington, KY, for Martin F. Maline, Peter G. Salmen, Jr., A. Gary Lavin, Jr., Donald Johnson, Melvyn Bowman, Harry Benson, and Other Unknown Officers, Directors, Employees, and Members of Kentucky Thoroughbred Association, Inc., Horsemen's Benevolent Protec-

tive Ass'n, Inc., and Kentucky, California, Florida, and Unknown Divisions of Horsemen's Benevolent and Protective Ass'n, Inc.

### OPINION AND ORDER

BERTELSMAN, Chief Judge.

#### I. Introduction

This action involves constitutional and interpretational challenges to the Interstate Horseracing Act ("IHA" or "the Act").[1] For the reasons set forth below, the court holds that the Act is an invalid restriction on commercial speech in violation of the First Amendment, as well as a fatally vague and irrational statute in violation of substantive due process. Accordingly, partial summary judgment is entered in favor of defendants that the Act is unconstitutional.

#### II. Factual Background

Defendant, Turfway Park Racing Association, Inc. ("Turfway"), operates a thoroughbred racetrack in Florence, Kentucky. Its racing schedule consists of a fall meet, a holiday meet, and a spring meet. Although various horse owners throughout the country enter their horses in the races at Turfway, the horse owners, trainers, jockeys, and their employees are not employees of the track. Plaintiff, Kentucky Division, Horsemen's Benevolent & Protective Association, Inc. ("KHBPA"), is a nonprofit Kentucky corporation whose membership consists of thoroughbred owners and trainers. The KHBPA provides benevolent programs and services for horsemen and their employees. Intervening plaintiff, Kentucky Thoroughbred Association, Inc. ("KTA"), is an organization similar to that of the KHBPA, but its membership includes owners, trainers, and breeders. For ease of reference, plaintiffs collec-

---

1. Interstate Horseracing Act of 1978, Pub.L. No. 95–515, 92 Stat. 1811, codified at 15 U.S.C. §§ 3001–3007 (1988). The text of the Act in its entirety is found at Appendix A to this opinion. Though passed by Congress some fifteen years ago, there has been little litigation regarding the Act. To date, only five reported federal decisions and one state court decision have even tangentially involved the Interstate Horseracing Act. *See Sterling Suffolk Racecourse Ltd. Partnership v. Burrillville Racing Ass'n*, 989 F.2d 1266 (1st Cir. 1993); *Retail, Wholesale & Dep't Store Union,* *Local 310 v. NLRB*, 745 F.2d 358 (6th Cir.1984); *New York Racing Ass'n, Inc. v. NLRB*, 708 F.2d 46 (2d Cir.1983); *Alabama Sportservice, Inc. v. National Horsemen's Benevolent & Protective Ass'n, Inc.*, 767 F.Supp. 1573 (M.D.Fla.1991); *New Suffolk Downs Corp. v. Rockingham Venture, Inc.*, 656 F.Supp. 1190 (D.N.H.1987); *Atlantic City Racing Ass'n v. Attorney Gen. of New Jersey*, 189 N.J.Super. 549, 461 A.2d 178 (Law Div.), *aff'd*, 198 N.J.Super. 247, 486 A.2d 1261 (App. Div.1983).

tively will be referred to as the "Horsemen," since that is the term used in the Act and by the parties.

For the past several years Turfway and the Horsemen entered into agreements governing the terms and conditions of racing at Turfway. The parties' last contract prior to this action was a three-year agreement that expired on April 30, 1992. It covered matters such as the amount of Turfway's commission or revenues from on-track wagers and from off-track intrastate and interstate wagers to be distributed to the horsemen's purses; the establishment of purse schedules and a horsemen's account by Turfway; the provision of stall and track facilities to horsemen by Turfway, including on-track office facilities for the KHBPA and KTA; and the agreement of KHBPA and KTA not to boycott races at Turfway. *See* Doc. # 4, Maline Affidavit, Ex. A. (hereinafter "Maline Aff."). During the summer of 1992, the parties undertook negotiations for a new contract, but reached no agreement prior to the start of the fall 1992 meet. All parties agreed, however, to extend the terms of the existing contract until the end of the fall meet. *Id.* ¶ 4.

Following the fall meet, the parties were again unsuccessful in reaching a new contract. The primary item of contention was the Horsemen's demands that Turfway increase the statutory split on intertrack wagers distributed by Turfway to the purses. *See* Doc. # 71, pp. 4–7.[2] The Horsemen notified Turfway that unless the parties agreed to a new contract, they would no longer provide their consent to interstate simulcasting of races at Turfway, as is required by the Interstate Horseracing Act.

Maline Aff., Ex. C; *see also* 15 U.S.C. § 3004(a)(1)(A) (1988).

At the start of the holiday meet on November 29, 1992, no contract existed between Turfway and the Horsemen. In an attempt to continue simulcasting of races without a contract, Turfway tried to obtain consent from individual horsemen directly. It did so by inserting in its entry blank form a paragraph providing that as a condition of entry in a race and in return for a certain percentage of the revenues received from interstate wagering, the entrant consented to any interstate simulcast of the race. *Id.* at Ex. G. Additionally, Turfway sought to obtain consent from the Kentucky Racing Commission for the interstate simulcasts, as is also required by the IHA under § 3004(a)(2). Apparently, the Commission agreed to consent as long as Turfway obtained the other consents required under IHA. *See* Doc. # 3, pp. 59–60 & Ex. 1.

In early December 1992, Turfway began simulcasting some of its holiday meet races. Thereafter, KHBPA instituted this suit against Turfway and other out-of-state off-track betting facilities.[3] The KHBPA claimed that Turfway violated the Act because it simulcast races without having first obtained the necessary consent from the horsemen's group as required by the Act, and that the entry blank consent relied upon by Turfway did not satisfy the consent requirement. The KHBPA further alleged that the off-track facilities, in accepting wagers on these races, violated the Act because the necessary consents had not been obtained.[4]

At the outset of this action, KHBPA moved for a preliminary injunction to re-

---

2. By statute, Kentucky provides for the apportionment of commissions received by receiving tracks among the host track and the receiving track as well as to their corresponding purse programs. This statutory distribution may be modified by contract. K.R.S. § 230.378(3) (Michie/Bobbs–Merrill Supp.1992).

3. The only off-track betting facilities identified in the original complaint were Rockingham Venture, Inc. and Governor of the Knight of Aksarben, Inc. *See* Doc. # 1. KHBPA later amended its complaint, dropping Governor as a defendant and adding Douglas Racing Corp., d/b/a Ak–Sar–Ben. *See* Doc. # 12. KHBPA later was granted leave to further amend, and it added Bensalem

Racing and Dakota Race Management as an additional defendant. *See* Docs. ## 34, 50. Churchill Downs, Inc., and the Thoroughbred Owners and Breeders Association were granted leave to file briefs amicus curiae, *see, e.g.,* Docs. ## 94, 96, 101, 102.

4. Later, the KHBPA was granted leave to amend to include an antitrust claim in violation of Section 2 of the Sherman Act. Turfway's counterclaim and third-party complaint alleges that the national HBPA encouraged its various state divisions to withhold their consent to interstate simulcasting unless the various host tracks accepted certain uniform policies adopted by HBPA. Turfway contends that this conduct amounts to

strain Turfway from simulcasting races. This motion was granted in modified form, with Turfway being permitted to simulcast races interstate during the pendency of these proceedings, provided all proceeds therefrom were placed in an escrow account. *See* Doc. # 8. The parties appeared before this court on two subsequent occasions on motions by KHBPA for preliminary injunctions. The first occurred when the Horsemen's office at Turfway Park was closed. To preserve the status quo, the court granted the injunction and ordered the office reopened. *See* Doc. # 30. The second occurred when the KHBPA sought to prohibit Turfway from including in its stall applications for the 1993 fall meet language concerning consent to interstate wagering. The court also granted this motion. Additionally, the court ordered the parties to maintain the "status quo" which existed at the time this lawsuit was filed pending the court's rulings on the substantive legal issues. *See* Doc. # 96.

Although originally scheduled for trial, a pretrial conference was held instead and the parties were given time to file additional memoranda regarding the validity and interpretation of the Act. *See* Docs. ## 66, 71. Currently pending before the court are the issues raised in Turfway's motion for summary judgment, Doc. # 76; the post-pretrial conference briefs of all of the other parties, Docs. ## 73, 74, 83; the responses thereto, *see, e.g.*, Docs. # 80, 81, 82, 84, 85; and Rockingham Venture's motion to dismiss, Doc. # 15. The parties have requested the court to expedite its decision on the constitutionality of the Act. Because the court has concluded that it is unconstitutional, only those grounds on which the Act is clearly invalid will be addressed below.[5]

### III. Analysis

### A. The Act Is An Invalid Restriction on Commercial Speech

■ In enacting the IHA, Congress included the consent provisions to promote its policy of regulating "interstate commerce with respect to wagering on horseracing, in order to further the horseracing and legal off-track betting industries in the United States," 15 U.S.C. § 3001(b) (1988), and to provide small tracks with the means of protecting their survival. *See* SENATE COMM. ON THE JUDICIARY, INTERSTATE HORSERACING ACT OF 1978, S.REP. NO. 1117, 95th Cong., 2d Sess. 2 (1978), *reprinted in* 1978 U.S.C.C.A.N. 4132, 4144, 4145 (hereinafter "S.REP.").

■ Analysis under the First Amendment must begin with a determination of whether the Act restricts or prohibits activity that constitutes some form of expression, and, if so, the classification of the speech. The "test for identifying commercial speech" is whether a communication constitutes an invitation to enter into a commercial transaction. *Board of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 473–74, 109 S.Ct. 3028, 3030–31, 106 L.Ed.2d 388 (1989); *see also United States v. Edge Broadcasting Co.,* —— U.S. ——, ——, 113 S.Ct. 2696, 2703, 125 L.Ed.2d 345 (1993).

Turfway's simulcasting of its races invites patrons of out-of-state tracks to bet on Turfway's races. Commercial transactions occur when these patrons place such bets. The simulcasts also act as an implied advertisement for the quality of the track and its racing as well as an implied invitation to the viewers to patronize Turfway if they are in the Northern Kentucky/Cincinnati area. Therefore, the simulcasts constitute commercial speech, and the Act allows it to be prohibited whenever one of the designated parties withholds consent.

■ For commercial speech to be protected by the First Amendment, it " 'at least must concern lawful activity and not be mis-

---

an unlawful conspiracy in restraint of trade in violation of section 1 of the Sherman Act, as well as in violation of state law and amounts to a tortious interference with Turfway's contractual rights. *See* Doc. # 25. All proceedings with respect to the counterclaim and third-party complaint were stayed by this court pending resolu-

tion of the challenge to the Act itself. *See* Doc. # 30.

5. There are other interesting issues, particularly the administrative law "delegation" argument. Time does not permit the court to enter this thorny thicket, however.

leading.' " *Fox,* 492 U.S. at 475, 109 S.Ct. at 3032 *citing Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y.,* 447 U.S. 557, 566, 100 S.Ct. 2343, 2351, 65 L.Ed.2d 341 (1980); *see also Edge,* —— U.S. at ——, 113 S.Ct. at 2703–04. Turfway's simulcasts meet these standards. Therefore, " 'we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.' " *Fox,* 492 U.S. at 475, 109 S.Ct. at 3032 *citing Central Hudson,* 447 U.S. at 566, 100 S.Ct. at 2351; *see also Edge,* —— U.S. at ——–——, 113 S.Ct. at 2703–04.

In *Fox,* the Supreme Court placed a gloss on this last criterion, stating:

"What our decisions require is a 'fit' between the legislature's ends and the means chosen to accomplish those ends ... a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is 'in proportion to the interest served;' ... that employs not necessarily the least restrictive means but ... **a means narrowly tailored to achieve the desired objective.**"

492 U.S. at 480, 109 S.Ct. at 3035 (emphasis added) (citations omitted); *see also Edge,* —— U.S. at ——–——, 113 S.Ct. at 2703–04. This court must, albeit reluctantly, hold that the means chosen by Congress are not "narrowly tailored to achieve [the] desired objective[s]." Therefore, the Act is an invalid restriction on commercial speech.

The means chosen by Congress to achieve its objectives consist primarily in allowing simulcasting subject to a veto in the unfettered discretion not only of two state agencies, but also of the Horsemen's organizations, potentially and actually the bitter ene-

mies of Turfway. These latter organizations can and are using this veto power, not only to prohibit Turfway from engaging in simulcasting, but also to attempt to leverage it concerning other activity imbued with fully protected non-commercial expression, such as its position in the ongoing contract negotiations.

This bargaining necessarily engenders a good deal of media statements by both sides such as might be experienced in a strike against a well-known company. In recent days, Turfway filed a motion for a temporary restraining order in this action, alleging that the Horsemen were engaged in an illegal boycott of its current racing meet. The Horsemen indignantly responded that they were not organizing any boycott, but how could they help it if Turfway's terms for racing were so unfair that none of their members would race? Don't they have a duty to their members to report to them on Turfway's invidious practices! At the hearing on the motion about half of the statements made by both sides were for the benefit of the court and the remainder for media consumption. Are the Horsemen likely to consider any request to simulcast this meet in an impartial manner giving due regard to Turfway's constitutionally protected rights of commercial and non-commercial speech?

Commercial speech has often been said to receive less protection under the First Amendment than non-commercial speech. *See, e.g., Outdoor Systems, Inc., v. City of Mesa,* 997 F.2d 604, 610 (9th Cir.1993). Nevertheless, it receives substantial protection, viz., the "intermediate scrutiny" of the "reasonable fit" test [6] outlined above. *Edenfield v. Fane,* —— U.S. ——, ——, 113 S.Ct. 1792, 1798, 123 L.Ed.2d 543 (1993); *Outdoor Systems,* 997 F.2d at 610.[7]

---

**6.** The "reasonable fit" test requires stricter scrutiny than the "rational basis" test discussed in subsequent portions of this opinion. *City of Cincinnati v. Discovery Network,* —— U.S. ——, —— n. 13, 113 S.Ct. 1505, 1510 n. 13, 123 L.Ed.2d 99 (1993).

**7.** Indeed, recently the Supreme Court has indicated that while

"commercial speech is entitled to 'lesser protection' only when the regulation is aimed at either the content of the speech or the particular adverse effects stemming from that content,

it would seem to follow that a regulation that is not so directed should be evaluated under the standards applicable to regulations on fully protected speech, not the more lenient standards by which we judge regulations on commercial speech."

*Discovery Network,* —— U.S. at —— n. 11, 113 S.Ct. at 1510 n. 11. This statement may be dicta, but it is carefully structured and thoughtful dicta. Thus the statute at issue here, which is not "aimed at the content of the speech or the particular adverse effects stemming from that con-

■ ' Whatever standard is used, however, the statute cannot withstand constitutional scrutiny. It has long been axiomatic in our constitutional jurisprudence that a "statute placing unbridled discretion in the hands of a government official or agency constitutes a prior restraint" and is anathema. *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 755–56, 108 S.Ct. 2138, 2142–43, 100 L.Ed.2d 771 (1988); *Outdoor Systems*, 997 F.2d at 613; *Hynes v. Mayor of Oradell*, 425 U.S. 610, 619–20, 96 S.Ct. 1755, 1760, 48 L.Ed.2d 243 (1976); *see Shuttlesworth v. City of Birmingham*, 382 U.S. 87, 90–92, 86 S.Ct. 211, 213–14, 15 L.Ed.2d 176 (1965); *Joseph Burstyn Inc., v. Wilson*, 343 U.S. 495, 503–505, 72 S.Ct. 777, 781–782, 96 L.Ed. 1098 (1952); *but cf. Kay v. Mills*, 490 F.Supp. 844 (D.C.Ky.1980).

*Lakewood* is illustrative. In that case, the City of Lakewood, Ohio, gave its mayor the authority to grant or deny applications for annual newsrack permits, but provided no standards to guide the exercise of his or her discretion. In that respect, the case was remarkably similar to *Hynes* and the other cases cited above and to many other authorities cited by the Court.

As observed by the Court: "At the root of this long line of precedent is the time-tested knowledge that in the area of free expression a licensing statute placing unbridled discretion in the hands of a government official or agency constitutes a prior restraint," *Lakewood*, 486 U.S. at 757, 108 S.Ct. at 2144, and

"[A] law or policy permitting communication in a certain manner for some but not for others raises the specter of content and viewpoint censorship. This danger is at its zenith when the determination of who may speak and who may not is left to the unbridled discretion of a government official. As demonstrated above we have often and uniformly held that such statutes or policies impose censorship on the public

or the press, and hence are unconstitutional, because without standards governing the exercise of discretion, a government official may decide who may speak and who may not based upon the content of the speech or viewpoint of the speaker."

*Lakewood*, 486 U.S. at 763–64, 108 S.Ct. at 2147 (emphasis added).[8]

The situation before this court is even more detrimental to the interests of free expression than that described in *Lakewood*. By no stretch of language or imagination could this statute constitute a "narrowly tailored" regulation of expression. Congress gives unfettered discretion to veto Turfway's simulcasts not only to public officials—the Kentucky racing commission, and the racing commissions of the receiving states—but, worse, to the Horsemen's organizations which are the enemies of Turfway.

That agreement by the Horsemen would be part of contract negotiations was a dynamic contemplated by Congress in drafting the statute. However, Congress seemed to assume that a contract would be reached prior to a racing meet. *See* S.REP. No. 1117, 1978 U.S.C.C.A.N. p. 4145 ("The bill provides for [consent] to be exercised in a particular manner, depending upon the existence of a contract and its terms between the track and its horsemen and horsewomen. It is intended that under certain circumstances, specified in the Act, such consent by the horsemen's group will be an issue to be considered as part of the regular contractual process, concurrent with other issues concerning the conduct of racing at that track, and not as an isolated issue."). In the present situation the design of the statute is inimical to the interests of free expression guaranteed by the First Amendment. It "may not be sustained [since] it provides only ineffective or remote support for the government's purpose." *Edenfield v. Fane*, —— U.S. ——, ——, 113 S.Ct. 1792, 1797, 123 L.Ed.2d 543 (1993).[9]

tent," probably should be scrutinized under the criteria applicable to protection of fully protected speech.

**8.** The requirement of standards is necessary for regulation of both commercial and non-commercial speech. *Discovery Network*, —— U.S. at —————————, 113 S.Ct. at 1512–13; *Outdoor Sys-*

*tems*, 997 F.2d at 610–13; *see also Hynes*, 425 U.S. at 616–22, 96 S.Ct. at 1758–61; discussion, *infra*, of the necessity of standards as an element of due process.

**9.** The Horsemen rely heavily on *Thomas Cusack Co. v. Chicago*, 242 U.S. 526, 37 S.Ct. 190, 61 L.Ed. 472 (1917) in which a veto power by local

## B. The Act Is A Vague and Irrational Means To Carry Out a Permissible Objective

■ The statutory scheme prohibits interstate simulcasting unless the track at which the race is being run (the "host" track) has "a written agreement with the horsemen's group, under which said racing association may give such consent, setting forth the terms and conditions thereto." 15 U.S.C. § 3004(a)(1)(A). This seems fairly straightforward. The trouble arises when one looks to the definition of "horsemen's group:" " '[H]orsemen's group' means, with reference to the host racing association [the broadcasting track] the group which represents the majority of owners and trainers racing there, for the races subject to the interstate off-track wager on any racing day." 15 U.S.C. § 3002(12).

This definition may be workable in a situation where, as apparently presumed by Congress, a horsemen's association has reached an agreement with the host track in advance of the racing meet. It falls apart, however, when the unhappy scenario exists, as it does here, that there are two horsemen's groups—rivals of each other and both at loggerheads with the track—and numerous owners and trainers unaffiliated with either group. The court has become all too familiar with the ambiguities and contradictions that arise when this state of affairs prevails.

First, the statute is self-contradictory in that § 3004(b) contemplates, as does the legislative history, that the consent of the horsemen's group will be obtained in the regular contractual process. However, § 3002 requires the identification of the relevant horsemen's group representing the majority of owners and trainers on each racing day.

Second, the statute is vague as to what it means by "owner." Some horses have many owners—some of which are partnerships, corporations or unincorporated consortia. Is it one horse one vote, or is a horse with ten owners entitled to 11 votes (counting the trainer)? What if there is more than one trainer? We are left to guess. What we

don't have to guess at is that each racing day will involve a separate election contest—and perhaps a separate motion for a temporary restraining order in this action, which will then achieve eternal life.

Third, the largest horsemen's group represents only 55% of owners eligible to race. Therefore, the possibility exists that on "any racing day" no horsemen's group will represent a majority of the owners and trainers. Is anyone's consent required in this situation?

Fourth, the parties have stipulated that entries to a race are usually closed 48 hours in advance. Scratches usually occur by 4 p.m. of the day prior to the race; however, emergency scratches are possible up to post time. What if a scratch changes the election result for that racing day? Must a scheduled simulcast be cancelled? Perhaps the race can be delayed while everyone runs down to the courthouse for an emergency hearing on whether limited partners count as "owners." Perhaps we can set up a courtroom at the racetrack as we do at the prisons!

Lastly, what is the meaning of "represent?" It seems like a simple word, but it has already caused the court considerable difficulty in trying to preside over this dispute. The statute gives a veto to the horsemen's group which "represents the majority of owners and trainers" on "any racing day." 15 U.S.C. § 3002(12) (emphasis added). Does this mean owners and trainers who merely belong to a horsemen's group? Or can Turfway, as it has tried to do by various means, solicit proxies or consents from a horsemen's group's members consenting to the simulcasting on a given day, or for all races during the meet in which the members enter their horses? Or indefinitely? An attorney might be a member of the American Bar Association, but it doesn't necessarily represent him or her in all of its positions.

■ The court is well aware of its duty to give every presumption of validity to an Act of Congress, and not to conjure up speculative interpretations. But the court is equally

residents over the erection of billboards was upheld. This case long antedates the development of the First Amendment jurisprudence discussed

here, and in the view of this court is not applicable in that context. The same may be said of the substantive due process discussion, *infra*.

aware that it is forbidden to rewrite the statute to save it. *E.g., United States v. Thirty–Seven Photographs*, 402 U.S. 363, 369, 91 S.Ct. 1400, 1404, 28 L.Ed.2d 822 (1971); *Blount v. Rizzi*, 400 U.S. 410, 419, 91 S.Ct. 423, 429, 27 L.Ed.2d 498 (1970). The difficulties listed are not speculative. The parties have already argued in open court about who is "represented" by the horsemen's associations who are the plaintiffs in this matter. Turfway has already solicited owners and trainers for individual consents to simulcasting. It has also attempted to insert in its race entries and stall applications consents to simulcasting, as a kind of contract of adhesion.

Not to be outdone, the Horsemen have threatened the receiving tracks with lawsuits if they show simulcasts to which the Horsemen have not consented. The receiving tracks must ascertain at their peril from thousands of miles away which, if any, horsemen's group represents a majority of owners and trainers on any racing day. What is the statutes' solution to all this? They give us no guidance. Yet heavy civil penalties are imposed for their violation. 15 U.S.C. § 3005. Therefore, because of their vagueness and irrationality, the statutes violate the principles of substantive due process.[10]

### (1) Vagueness

"[T]he void for vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983) (citations omitted); *see also Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982); *Grayned v. City of Rockford*, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). Although the void for vagueness doctrine is commonly seen in criminal and First Amendment contexts, "[v]ague laws in any area suffer a constitutional infirmity." *Ashton v. Kentucky*, 384 U.S. 195, 200, 86 S.Ct.

1407, 1410, 16 L.Ed.2d 469 (1966) (citations omitted); *Kay v. Mills*, 490 F.Supp. at 850 n. 12 (election candidate).

The above list of ambiguities in the statute shows that neither the court nor the parties have any way of knowing how the statute should be applied in the context of an ongoing dispute between Turfway and the Horsemen, which is essentially an acrimonious strike. The statute does not inform ordinary people (or even experts) what conduct is required or prohibited although they are exposed to heavy penalties for violating it. In the present context it leads to continuing litigation and, since its enforcement has been given over to private parties, to arbitrary enforcement. Furthermore, the statutes are not designed for application in a situation where a track does not have an agreement with a horsemen's group in advance of the meet. The statute is impossible to apply with certainty on a day-to-day basis in the context of an ongoing dispute. To try to make it more definite by interpretation is pure guesswork. Accordingly, the court must hold that it is void for vagueness.

### (2) Irrationality

■ Substantive due process requires that a statute have a rational relationship to a legitimate legislative goal. *See generally Pearson v. City of Grand Blanc*, 961 F.2d 1211 (6th Cir.1992). The Act is directed to interstate gambling, an activity which Congress has the right to regulate under its interstate commerce power, and in a general sense regulating simulcasting is rationally related to that end.

■ Substantive due process, however, imposes another requirement—the means of regulation chosen must be rationally related to achieving the goals of the statute. A legislative enactment is invalid under substantive due process analysis " 'if it fails to advance a legitimate governmental interest **or if it is an unreasonable means of advancing a legitimate governmental interest.**' " *Mansfield Apt. Owners v. City of Mansfield*, 988 F.2d 1469, 1477 (6th Cir.1993)

---

**10.** The court classifies the void for vagueness doctrine as part of substantive due process, in the sense that it emanates from the due process

clause, but is not procedural due process. *See Pearson v. City of Grand Blanc*, 961 F.2d 1211, 1216–17 (6th Cir.1992).

(emphasis added) (quoting *Curto v. City of Harper Woods*, 954 F.2d 1237, 1243 (6th Cir. 1992).

Here, Congress' announced goal is the promotion of horseracing, especially the preservation of small tracks, while protecting the interests of horsemen and the public. Providing a private party with an absolute veto over the simulcasting without any standards to guide it, virtually assures that the statute will be applied, not to achieve Congress' goal, but for selfish motives. The conduct of the parties in this matter amply demonstrates that they favor selfish interests over public ones. Furthermore, there is no review of the Horsemen's reasons for exercising their veto power. Indeed, there is no requirement in the Act that the Horsemen exercise their veto power to promote Congress' goal rather than their own short-term economic interest, which may be contrary to Congress' objectives.

As the foregoing discussion shows, the Act promotes controversy and confusion. The statutes are not only not rationally related to, but totally counterproductive in, achieving the legislative goal in the present situation, which is not unlikely to occur again, here or elsewhere. It has resulted in a cessation of simulcasting on at least one occasion, and is a cause of a partial cancellation of the current meet.

Because the Act is vague and an irrational means of carrying out a permissible objective, the statute must be declared unconstitutional on substantive due process grounds as well.

Therefore, the court being advised, **IT IS ORDERED AS FOLLOWS:**

1. That the Interstate Horseracing Act, 15 U.S.C. §§ 3001–3007 be, and it is, hereby adjudged unconstitutional as applied;[11]

2. That accordingly, Turfway's motion for partial summary judgment on this ground (Doc. # 76–1) be, and it is, hereby **GRANTED;**

3. That the court expresses no opinion regarding the other issues raised;

4. That the parties shall engage in intense settlement negotiations in light of this order and shall orally report to the court on the progress thereof and on any remaining issues in this action and a proposed time frame for resolving these issues at a status conference to be held on September 24, 1993 at 11:00 a.m.

## APPENDIX A

### Interstate Horseracing Act of 1978

§ 3001. **Congressional findings and policy**

(a) The Congress finds that—

(1) the States should have the primary responsibility for determining what forms of gambling may legally take place within their borders;

(2) the Federal Government should prevent interference by one State with the gambling policies of another, and should act to protect identifiable national interests; and

(3) in the limited area of interstate off-track wagering on horseraces, there is a need for Federal action to ensure States will continue to cooperate with one another in the acceptance of legal interstate wagers.

(b) It is the policy of the Congress in this Act to regulate interstate commerce with respect to wagering on horseracing, in order to further the horseracing and legal off-track betting industries in the United States.

§ 3002. **Definitions**

For the purposes of this Act the term—

(1) "person" means any individual, association, partnership, joint venture, corporation, State or political subdivision thereof, department, agency, or instrumentality of a State or political subdivision thereof, or any other organization or entity;

(2) "State" means each State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States;

---

11. Having determined the statute is unconstitutional as applied, the court does not reach an overbreadth analysis. *Fox*, 492 U.S. at 484–485, 109 S.Ct. at 3037.

(3) "interstate off-track wager" means a legal wager placed or accepted in one State with respect to the outcome of a horserace taking place in another State;

(4) "on-track wager" means a wager with respect to the outcome of a horserace which is placed at the racetrack at which such horserace takes place;

(5) "host State" means the State in which the horserace subject to the interstate wager takes place;

(6) "off-track State" means the State in which an interstate off-track wager is accepted;

(7) "off-track betting system" means any group which is in the business of accepting wagers on horseraces at locations other than the place where the horserace is run, which business is conducted by the State or licensed or otherwise permitted by State law;

(8) "off-track betting office" means any location within an off-track State at which off-track wagers are accepted;

(9) "host racing association" means any person who, pursuant to a license or other permission granted by the host State, conducts the horserace subject to the interstate wager;

(10) "host racing commission" means that person designated by State statute or, in the absence of statute, by regulation, with jurisdiction to regulate the conduct of racing within the host State;

(11) "off-track racing commission" means that person designated by State statute or, in the absence of statute, by regulation, with jurisdiction to regulate off-track betting in that State;

(12) "horsemen's group" means, with reference to the applicable host racing association, the group which represents the majority of owners and trainers racing there, for the races subject to the interstate off-track wager on any racing day;

(13) "parimutuel" means any system whereby wagers with respect to the outcome of a horserace are placed with, or in, a wagering pool conducted by a person licensed or otherwise permitted to do so under State law, and in which the participants are wagering with each other and not against the operator;

(14) "currently operating tracks" means racing associations conducting parimutuel horseracing at the same time of day (afternoon against afternoon; nighttime against nighttime) as the racing association conducting the horseracing which is the subject of the interstate off-track wager;

(15) "race meeting" means those scheduled days during the year a racing association is granted permission by the appropriate State racing commission to conduct horseracing;

(16) "racing day" means a full program of races at a specified racing association on a specified day;

(17) "special event" means the specific individual horserace which is deemed by the off-track betting system to be of sufficient national significance and interest to warrant interstate off-track wagering on that event or events;

(18) "dark days" means those days when racing of the same type does not occur in an off-track State within 60 miles of an off-track betting office during a race meeting, including, but not limited to, a dark weekday when such racing association or associations run on Sunday, and days when a racing program is scheduled but does not take place, or cannot be completed due to weather, strikes and other factors not within the control of the off-track betting system;

(19) "year" means calendar year;

(20) "takeout" means that portion of a wager which is deducted from or not included in the parimutuel pool, and which is distributed to persons other than those placing wagers;

(21) "regular contractual process" means those negotiations by which the applicable horsemen's group and host racing association reach agreements on issues regarding the conduct of horseracing by the horsemen's group at that racing association;

(22) "terms and conditions" includes, but is not limited to, the percentage which is paid by the off-track betting system to the host racing association, the percentage which is paid by the host racing association to the horsemen's group, as well as any arrangements as to the exclusivity between the host racing association and the off-track betting system.

## § 3003. Acceptance of interstate off-track wager

No person may accept an interstate off-track wager except as provided in this Act.

## § 3004. Regulation of interstate off-track wagering

**(a) Consent of host racing association, host racing commission, and off-track racing commission as prerequisite to acceptance of wager.** An interstate off-track wager may be accepted by an off-track betting system only if consent is obtained from—

(1) the host racing association, except that—

(A) as a condition precedent to such consent, said racing association (except a not-for-profit racing association in a State where the distribution of off-track betting revenues in that State is set forth by law) must have a written agreement with the horsemen's group, under which said racing association may give such consent, setting forth the terms and conditions relating thereto; provided,

(B) that where the host racing association has a contract with a horsemen's group at the time of enactment of this Act [enacted Oct. 25, 1978] which contains no provisions referring to interstate off-track betting, the terms and conditions of said then-existing contract shall be deemed to apply to the interstate off-track wagers and no additional written agreement need be entered into unless the parties to such then-existing contract agree otherwise. Where such provisions exist in such existing contract, such contract shall govern. Where written consents exist at the time of enactment of this Act [enacted Oct. 25, 1978] between an off-track betting system and the host racing association providing for interstate off-track wagers, or such written consents are executed by these parties prior to the expiration of such then-existing contract, upon the expiration of such then-existing contract the written agreement of such horsemen's group shall thereafter be required as such condition precedent and as a part of the regular contractual process, and may not be withdrawn or varied except in the regular contractual process. Where no such written consent exists, and where such written agreement occurs at a racing association which has a regular contractual process with such horsemen's group, said agreement by the horsemen's group may not be withdrawn or varied except in the regular contractual process;

(2) the host racing commission;

(3) the off-track racing commission.

**(b) Approval of tracks as prerequisite to acceptance of wager; exceptions.**

(1) In addition to the requirement of subsection (a), any off-track betting office shall obtain the approval of—

(A) all currently operating tracks within 60 miles of such off-track betting office; and

(B) if there are no currently operating tracks within 60 miles then the closest currently operating track in an adjoining State.

(2) Notwithstanding the provisions of paragraph (1) of this subsection, any off-track betting office in a State with at least 250 days of on-track parimutuel horseracing a year, may accept interstate off-track wagers for a total of 60 racing days and 25 special events a year without approval required by paragraph (1), if with respect to such 60 racing days, there is no racing of the same type at the same time of day being conducted within the off-track betting State within 60 miles of the off-track betting office accepting the wager, or such racing program cannot be completed. Excluded from such 60 days and from the consent

required by subsection (b)(1) may be dark days which occur during a regularly scheduled race meeting in said off-track betting State. In order to accept any interstate off-track wager under the terms of the preceding sentence the off-track betting office shall make identical offers to any racing association described in subparagraph (A) of subsection (b)(1). Nothing in this subparagraph shall be construed to reduce or eliminate the necessity of obtaining all the approvals required by subsection (a).

(c) **Takeout amount.** No parimutuel off-track betting system may employ a takeout for an interstate wager races run takeout for corresponding wagering pools of off-track wagers on races run within the off-track State except where such greater takeout is authorized by State law in the off-track State.

## § 3005. Liability and damages

Any person accepting any interstate off-track wager in violation of this Act shall be civilly liable for damages to the host State, the host racing association and the horsemen's group. Damages for each violation shall be based on the total of off-track wagers as follows:

(1) If the interstate off-track wager was of a type accepted at the host racing association, damages shall be in an amount equal to that portion of the takeout which would have been distributed to the host State, host racing association and the horsemen's group, as if each such interstate off-track wager had been placed at the host racing association.

(2) If such interstate off-track wager was of a type not accepted at the host racing association, the amount of damages shall be determined at the rate of takeout prevailing at the off-track betting system for that type of wager and shall be distributed according to the same formulas as in paragraph (1) above.

## § 3006. Civil action

(a) **Parties; remedies.** The host State, the host racing association, or the horsemen's group may commence a civil action against any person alleged to be in violation of this Act, for injunctive relief to restrain violations and for damages in accordance with section 6.

(b) **Intervention.** In any civil action under this section, the host State, the host racing association and horsemen's group, if not a party, shall be permitted to intervene as a matter of right.

(c) **Limitations.** A civil action may not be commenced pursuant to this section more than 3 years after the discovery of the alleged violation upon which such civil action is based.

(d) **State as defendant.** Nothing in this Act shall be construed to permit a State to be sued under this section other than in accordance with its applicable laws.

## § 3007. Jurisdiction and venue

(a) **District court jurisdiction.** Notwithstanding any other provision of law, the district courts of the United States shall have jurisdiction over any civil action under this Act, without regard to the citizenship of the parties or the amount in controversy.

(b) **Venue; service of process.** A civil action under this Act may be brought in any district court of the United States for a district located in the host State or the off-track State, and all process in any such civil action may be served in any judicial district of the United States.

(c) **Concurrent state court jurisdiction.** The jurisdiction of the district courts of the United States pursuant to this section shall be concurrent with that of any State court of competent jurisdiction located in the host State or the off-track State.