Preach FLEMING, Albert Lee Rowland and C.H. Meadows, Joe Fleming, Petitioners,

v.

UNITED STATES DEPARTMENT OF AGRICULTURE, Respondent.

Nos. 81–3685, 82–3015 and 82–3095.

United States Court of Appeals, Sixth Circuit.

Argued May 2, 1983.

Decided July 13, 1983.

Rehearing and Rehearing En Banc Denied Oct. 4, 1983.

Edward F. Gordon (argued), Gordon, Bottorff & Waters, Brentwood, Tenn., for petitioners in all cases.

William L. Abernathy, Jr., Brentwood, Tenn., for petitioners in Nos. 82–3015 and 82–3095.

Raymond W. Fullerton (argued), U.S. Dept. of Agriculture, Washington, D.C., for respondent in all cases.

Terrence G. Jackson, U.S. Dept. of Agriculture, Washington, D.C., for respondent in No. 81–3685.

Morris L. Selinger, U.S. Dept. of Agriculture, Washington, D.C., for respondent in No. 82–3015.

Donald K. Silver, U.S. Dept. of Agriculture, Washington, D.C., for respondent in No. 82–3095.

\* Honorable Avern Cohn, United States District Court for the Eastern District of Michigan, sitting by designation.

1. The Department of Agriculture's Judicial Officer serves as the delegate of the Secretary of Agriculture for judicial matters. 7 C.F.R. § 2.35 (1982).

2. Joe Fleming was fined $2,000 and disqualified for one year for showing "Delight's Moonlight" in a sored condition on April 1, 1977. (This horse was ridden and owned by Mr. Joe Christmas. Charges against Christmas were resolved in a consent decree.) Rowland was fined $2,500 and disqualified for one year, and Meadows was fined $1,750 for showing "Masterpiece Queen B" in a sored condition on August 28, 1978. Preach Fleming was fined $2,000 and disqualified for one year for showing "Ebony's Bad Loser" in a sored condition during August 1978. There is no claim in these cases that the owners of the sored horses did not "permit" their horses to be shown in a sored condition. *See* 15 U.S.C. § 1824(2)(D). We are not, therefore, presented with the issue of whether an owner who expressly forbids soring, is not present at the show and has no actual knowl-

Before KENNEDY and JONES, Circuit Judges, and COHN,\* District Judge.

CORNELIA G. KENNEDY, Circuit Judge.

■ Appellants Preach Fleming, Albert Lee Rowland, C.F. Meadows and Joe Fleming were found in three separate administrative hearings to have shown "sored" Tennessee Walking Horses in violation of the Horse Protection Act, 15 U.S.C. § 1821 *et seq.* (1976). The Judicial Officer of the United States Department of Agriculture [1] (USDA) affirmed these findings of the Administrative Law Judges (ALJ) and the assessment of civil penalties under the Act.[2] The appellants seek review of that decision pursuant to 15 U.S.C. § 1825(b)(2).[3]

Tennessee Walking Horses are best known for their high step and exaggerated gait. This characteristic, while partially natural, is usually developed and enhanced by careful training. The desired characteristic may also be induced by creating tenderness or soreness in the horse's front legs through use of chemical blistering agents, chains, tacks or other devices. The

edge that his horse is sored may nonetheless be held responsible under the Act. For this reason we decline the USDA's invitation to express any opinion as to the correctness of the Eighth Circuit's decision in *Burton v. United States Department of Agriculture,* 683 F.2d 280 (8th Cir.1982).

3. Title 15 U.S.C. § 1825(b)(2) provides jurisdiction in the United States Court of Appeals for the District of Columbia or in the circuit of the accused parties' residence. In this case the USDA alludes that Mr. Meadows actually resides in Alabama and is not, therefore, within the jurisdiction of the Sixth Circuit. While the record does show that Meadows resides in Alabama it also indicates that his place of business, insofar as Tennessee Walkers are concerned, is in Tennessee. It is there, at the Tennessee farm of Rowland, that Meadows keeps the horse at issue in this case. The USDA does not challenge this basis for jurisdiction. Nor have the parties addressed the issue of whether the language of § 1825(b)(2) imposes a jurisdictional condition or only one of venue. Under these circumstances, we find that this Court may properly exercise jurisdiction over Meadows' appeal.

practice of artificially inducing the high stepping characteristic, or "big lick," is known as "soring." In 1970 Congress prohibited the showing of horses that had been "sored." In 1976 Congress increased the penalties for soring, created a presumption of soring when a horse exhibits abnormal sensitivity in either both front or both back legs and, in the case of civil violations, eliminated the requirement of a specific intent to sore.

The statute requires that each horse must be examined before a show performance by a local "designated qualified person" (DQP) who may disqualify any horse which appears to have been sored in violation of the Act. This pre-show examination is apparently brief and may or may not be conducted by a veterinarian. After this pre-show exam, the horse's ring performance is studied by USDA veterinarians. On the basis of their observations these veterinarians select certain horses for a more thorough post-show examination. At this examination the horse is first inspected visually for signs of soring such as abnormal scar tissue, lack of hair, lesions, or other visible indicators of abuse. Photographs are taken to document any such evidence. The horse's legs are then examined with a thermograph machine—a heat sensitive device which can reveal abnormal infrared heat patterns in the horse's legs indicative of inflammation. Finally, the horse is examined by "digital palpation" which essentially consists of pressing one's thumbs into the flesh of the horse's forelegs or "pasterns." By using palpation the veterinarian can diagnose abnormal sensitivity or pain in the horse's legs. If the examining veterinarian decides

that the horse has been sored, a second veterinarian conducts an independent evaluation. If both examining veterinarians find that a horse has been sored it is then "written up" and affidavits prepared.

After providing notice and an opportunity for a hearing, the USDA is authorized to issue civil fines of up to $2,000 for each violation and disqualify the responsible parties from exhibiting any horse, or managing or judging any show for not less than one year for the first violation and not less than five years for subsequent violations. 15 U.S.C. § 1825(b)(1), (c).[4] The accused parties may appear before an ALJ who hears the case *de novo.* The decision of the ALJ may be appealed to the USDA Judicial Officer and subsequently to the Court of Appeals. 15 U.S.C. § 1825(b)(2).

The evidence of soring found in each of the three cases consolidated for appeal is very similar. Each horse passed a brief pre-show examination and was allowed to perform. USDA veterinarians selected each horse for post-show examination based upon an appearance of probable soreness observed during the horses' ring performances.

The post-show examination of each horse revealed lesions and unusual scar tissue on the horses' front legs.[5] Thermographs of the horses all revealed abnormal heat distribution indicative of soring in the pasterns.[6] Physical examination of the horses by means of digital palpation showed abnormal sensitivity in their forelegs leading each examining veterinarian—at least two for each horse—to independently conclude that the horses had been sored.[7] According to

---

**4.** The parties are subject to criminal penalties for "knowing" violations of the prohibition created by § 1824. 15 U.S.C. § 1825(a).

**5.** The Preach Fleming horse and the Rowland and Meadows horse also had an unauthorized black substance on their legs—presumably used to cover up the horse's condition. The use of such substances is prohibited by regulation. 9 C.F.R. § 11.2(c). Rowland and Meadows were also cited for using chains placed too near the horse's sensitive "coronary band" just above its hooves. *See* 9 C.F.R. § 11.2(a).

**6.** In each of the present cases the thermograph operator was a trained veterinarian who independently concluded on the basis of abnormal heat patterns common to both of each horses' front legs that the horses had been sored.

**7.** The indicator of soreness revealed by digital palpation of the horse's legs consists primarily of the horse's physical reaction to touch. According to testimony presented by the USDA, a sored horse will react with great sensitivity and pain to pressure placed on abused areas by flinching, rapidly withdrawing its feet, labored

several of the veterinarians, the horses had been subject to repeated abuse. The ALJ agreed with the USDA and, based upon the direct evidence presented, issued the fines and disqualifications now appealed.

The appellants raise four closely related challenges to their liability under the rubric of due process, as well as arguing that the administrative decision was not supported by substantial evidence. Their rights to procedural due process, appellants assert, have been denied in that:

(1) There is no "objectively manifest standard" by which those subject to the Act can know what the criteria for liability are; (2) The testing procedures utilized by the USDA in determining that a horse has been sored are not uniform or standardized and are based solely upon the subjective evaluations of USDA veterinarians; (3) Post-show examination is an inherently suspect and unreliable basis for determining whether a horse has been sored because of the potential effect of ring performance on the horse's condition; (4) The Act's presumption that a horse has been sored when abnormal sensitivity is found in both front (or both back) legs is arbitrary when based upon post-show examination evidence. None of the appellants' arguments are meritorious.

## A. Appellants' Due Process Challenges

It is axiomatic that the due process clause of the fifth amendment protects individuals against arbitrary deprivations of liberty or property by the federal government. This includes protection against arbitrary intrusion by the government of one's right to practice a chosen profession. See *Greene v. McElroy*, 360 U.S. 474, 492, 79 S.Ct. 1400, 1411, 3 L.Ed.2d 1377 (1959). In the present case the appellants clearly face governmental intrusion upon such rights and, therefore, may properly assert the application of due process considerations. Procedural due process is, however, a "flexible" concept which must be adapted to the particular circumstances of the alleged deprivation. See *Mathews v. Eldridge*, 424 U.S. 319, 334, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976). What process is due depends upon: (a) the private interest affected by the government action; (b) the risk of erroneous deprivation and the value of additional safeguards; (c) the government's interests, including the importance of the function and fiscal and administrative burdens. *Id.* at 335, 96 S.Ct. at 903. The most basic consideration is whether the person being deprived of a liberty or property interest has been given an opportunity to be heard at a meaningful time and in a meaningful manner. *Id.* at 333, 96 S.Ct. at 902. The notion that the administrative process must be conducted in a fashion which will ensure accuracy and a fair consideration of the affected parties' case is fundamental to this concept. See, e.g., *Banks v. FAA*, 687 F.2d 92, 93–95 (5th Cir.1982); *Helms v. Hewitt*, 655 F.2d 487, 501–503 (3d Cir.1981), *cert. granted*, 455 U.S. 999, 102 S.Ct. 1629, 71 L.Ed.2d 865 (1982); *Devine v. Cleland*, 616 F.2d 1080, 1088 (9th Cir.1980). See also *Mathews*, 424 U.S. at 349, 96 S.Ct. at 909; *Richardson v. Perales*, 402 U.S. 389, 401–402, 410, 91 S.Ct. 1420, 1427–1428, 1431, 28 L.Ed.2d 842 (1970).

The appellants in this case do not challenge, as such, the sufficiency of the rules of practice or procedural safeguards which govern proceedings before the USDA under the Horse Protection Act's regulations.[8] Rather, their due process challenge is focused on the alleged unreliability of post-

---

breathing and anxiousness as well as tightened stomach muscles and abnormal perspiration.

**8.** Nor would such a challenge succeed. The parties responsible for a horse found to be sored may request re-examination within 24 hours of the original post-show examination. 9 C.F.R. § 11.4(h)(1). The regulations then provide for a hearing before an Administrative Law Judge complete with adequate prior notice, the right to appear with legal counsel, present evidence, cross-examine witnesses and undertake some limited discovery. See 7 C.F.R. § 1.130 *et seq.* (Title 7, Subtitle A, Subpart H of Part 1). They also provide for a right to seek review of the ALJ's decision by the USDA judicial officer. Subsequent judicial review by a Court of Appeals is then available by statute. 15 U.S.C. § 1825(b)(2).

show examination evidence and the vagueness of the Act's standards for finding that a horse has been sored.

### 1. Vagueness

The appellants assert that the standards utilized by the USDA to find a horse sored are insufficiently definite to fairly apprise those involved in the industry as to what conduct is forbidden. We disagree.

■ The constitutional prohibition against vague laws satisfies two basic concerns. First, it provides "fair warning" so as to safeguard the innocent and, second, it avoids arbitrary applications of the law by insisting upon explicit standards regulating conduct. *Grayned v. City of Rockford*, 408 U.S. 104, 108–109, 92 S.Ct. 2294, 2298–2299, 33 L.Ed.2d 222 (1972). To these ends, due process requires that government regulations and statutes provide adequate warning as to what they command or forbid such that persons of common intelligence will not have to guess as to their meaning and may act accordingly. *See, e.g., Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982); *Diebold, Inc. v. Marshall*, 585 F.2d 1327, 1336 (6th Cir.1978). This standard for definiteness is less stringently measured in the absence of either criminal penalties or potential interference with constitutionally protected rights. 455 U.S. at 499, 102 S.Ct. at 1194; *Diebold, Inc.*, 585 F.2d at 1337. When the persons affected by the regulations are a select group with specialized understanding of the subject being regulated the degree of definiteness required to satisfy due process concerns is measured by the common understanding and commercial knowledge of the group. *Id.* at 1336; *Precious Metals Associates, Inc. v. Commodities Futures Trading Commission*, 620 F.2d 900, 907 (1st Cir. 1980); *United States ex rel. Shott v. Tehan*, 365 F.2d 191, 198 (6th Cir.1966), *cert. denied*, 385 U.S. 1012, 87 S.Ct. 716, 17 L.Ed.2d

548 (1967). The sufficiency of notice provided by a statute must be viewed "in light of the conduct with which a defendant is charged." *See United States v. National Dairy Corp.*, 372 U.S. 29, 32, 83 S.Ct. 594, 597, 9 L.Ed.2d 561 (1963). A strong presumptive validity attaches to acts of Congress and "statutes are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language." *Id.; Jordan v. De George*, 341 U.S. 223, 231, 71 S.Ct. 703, 707, 95 L.Ed. 886 (1951).

Although the appellants have failed to identify precisely what portion of the Act they consider to be vague, it appears that the challenge is directed to the Act's definition of "sore." Section 1821(3) [9] of the Act provides:

(3) The term "sore" when used to describe a horse means that—

(A) an irritating or blistering agent has been applied, internally or externally, by a person to any limb of a horse,

(B) any burn, cut, or laceration has been inflicted by a person on any limb of a horse,

(C) any tack, nail, screw, or chemical agent has been injected by a person into or used by a person on any limb of a horse, or

(D) any other substance or device has been used by a person on any limb of a horse or a person has engaged in a practice involving a horse,

and, as a result of such application, infliction, injection, use, or practice, such horse suffers, or can reasonably be expected to suffer, physical pain or distress, inflammation, or lameness when walking, trotting, or otherwise moving, except that such term does not include such an application, infliction, injection, use, or practice in connection with the therapeutic

---

**9.** The same definition of sore is given in the USDA regulations promulgated under the Act. *See* 9 C.F.R. § 11.1(y) (1982). The regulations also provide a series of more specific prohibitions including the use of any "chain, boot,

roller, collar, action device, or any other device" if "such use causes or can reasonably be expected to cause such horse to be sore." 9 C.F.R. § 11.2(a).

treatment of a horse by or under the supervision of a person licensed to practice veterinary medicine in the State in which such treatment was given.

■ This basic standard for soreness clearly and explicitly warns that use of any of the specified practices which "results" in the horse suffering, or reasonable expectation that the horse will suffer, "physical pain or distress, inflammation, or lameness when walking, trotting, or otherwise moving," is prohibited. The notice provided by this language is well within the boundaries of due process. A person of common understanding and intelligence would be fairly appraised by the literal language of this definition that one can not cause a horse to suffer physical pain or discomfort or lameness through the use of any device or substance. Such language and what conduct it prohibits must necessarily be abundantly clear, albeit disliked by those who have been accustomed to soring their horses, to participants in the Tennessee Walking Horse industry. The legislative history of the Act and its 1976 revision indicate that the practice of soring is widespread and well known in that industry. In light of the readily identifiable conduct prohibited by the Act and the specialized understanding of that conduct by those in the industry, the appellants' challenge on vagueness grounds fails.

2. Lack of Uniform Examination Procedures and Standards

■ Appellants also assert that there are no uniform methods or objectively manifest criteria by which veterinarians conducting post-show examinations are to make the determination as to soreness. Appellants' argument is that since this absence leaves the determination that a horse is sore up to the supposedly subjective opinions of the examining veterinarians, due process is denied. This argument is meritless.

First, the determination that a horse has been sored for purposes of imposing liability is made not by the examining veterinarians but by an ALJ. In determining liability the ALJ reviews all relevant evidence including any proof that the accused party may produce indicating that the "subjective" opinions of the examining veterinarians are not credible or are otherwise flawed. As with any expert witness the opinion placed in evidence must be based on evaluation of objective observations. To the degree that any one veterinarian's opinion that a horse is sore is subjective—that is, lacks objective basis in fact—it is subject to being discredited by the accused. More importantly, in the present cases, no one opinion of any examining veterinarian serves as the sole evidentiary basis for decision. At least two veterinarians make independent valuations of the horse being examined. Moreover, the ALJ considers more than just the ultimate conclusions of those opinions. Examining veterinarians describe in their affidavits the objective factual basis for the conclusions reached and that basis is subject to cross-examination before the ALJ. In the instant cases, the opinions of the examining veterinarians were each corroborated by objective evidence of soring such as scarring, lesions, thermograph tests, the horse's reaction to palpation and reluctance to place weight on its front feet.

Second, while the statute and regulations do not detail a uniform method of testing for soreness, it is apparent from the testimony regarding the examinations conducted in these cases that uniform methodology and criteria were utilized to guide the veterinarians in their judgments. In each case the examining veterinarians followed the same methods and conducted the same tests. The criteria used in those tests are clear; does the horse exhibit signs of pain and inflammation indicative of soring? Physical examination reveals lesions, unusual loss of hair, scarring or other visual signs of abuse. Palpation reveals sensitivity to touch and the thermograph reveals heating patterns indicative of inflammation of tissue. The appellants have no basis to complain that the procedures employed by the USDA were not adequate in the present cases. *See United States v. Raines,* 362 U.S. 17, 21, 80 S.Ct. 519, 522, 4 L.Ed.2d 524 (1960).

■ Finally, accepting that the opinions of the examining veterinarians are subjective to a degree, that subjectivity is no more than that inherently present whenever expert opinion is used for evidentiary purposes in adjudicative proceedings. The evidentiary use of expert opinions, in particular those supported by live testimony and subject to the defendants' cross-examination, does not violate the due process clause. *See, e.g., Richardson v. Perales,* 402 U.S. 389, 408, 91 S.Ct. 1420, 1431, 28 L.Ed.2d 842 (1971); *Lloyd Sabaudo Societa v. Elting,* 287 U.S. 329, 339–340, 53 S.Ct. 167, 172, 77 L.Ed. 341 (1932).

### 3. Use of Inherently Unreliable Post-Show Examination Evidence

■ Appellants contend that post-show examinations of horses which have just performed are inherently unreliable because of the potential that a horse may have developed the symptoms of soreness during its performance in the ring. Testing procedures, the appellants assert, are the first and most crucial step in the administration of the Act and therefore must be conducted in a manner which ensures accurate, reliable findings. Since a horse's performance in the ring may increase its sensitivity, there is a sufficient likelihood of error in post-show evidence that fundamental fairness is denied when that evidence becomes the basis for liability under the Act.

The appellants' argument is flawed on several bases. First, they have not shown that the post-show examination is prone to error. Appellants did produce one veterinarian who asserts that the post-show examination is to the "disadvantage" of everyone involved but he does not claim that this "disadvantage" makes the examination inherently unreliable. He also asserts that there are many variables which affect a horse's sensitivity such as length of workout, ring conditions and individual characteristics of each horse. Palpation results, the doctor concludes, are very likely to vary depending upon whether the test is conducted prior to or after performance. He does not state, however, that examining veterinarians are unable to account for these variations or even that such variations make a conclusion of soreness after performance somehow unreliable. The USDA veterinarians testified as to their awareness of the potential effect of such variables. Moreover, most of the evidence of soring relied upon by the USDA was not such that could have been caused by show performance.[10] For example, the horses were found to be extremely sensitive in the same locations on *both* forelegs, were found to have scarring indicative of abuse, were selected for post-show examination because they *performed* like horses that had been sored, revealed repeated "insult" to each foreleg in locations typically used for soring and displayed heat patterns on their thermographs indicative only of inflammation resulting from soring practices.

---

10. There was testimony by one of the examining USDA veterinarians that performance was unlikely to have in any way caused the injuries found unless the horse's sensitivity had been increased during performance by the use of "action devices." Thus, a horse could be on the borderline of pain prior to the show and become inflamed to the point of pain by the use of such devices during performance. As the Judicial Officer points out this source of soreness would not excuse the owner or trainer since the use of such devices is prohibited if they result in soring the horse. See 9 C.F.R. § 11.2. This is true whether or not the device (often a chain or boot which strikes the horse on the pasterns near the coronary band while moving) was actually used for that purpose. The 1976 revision of the Act eliminated the need for any specific intent to cause soreness thereby making it solely the participant's responsibility to ensure that devices used do not result in pain for the horse. *See* 15 U.S.C. § 1821(3)(D); H.Rep. No. 94–1174, 94th Cong., 2d sess. 1–2 (1976) *reprinted in* [1976] U.S. Code Cong. & Ad.News 1696. The Rowland and Meadows' horse and Joe Fleming horse were both found to have had chains placed in positions near their coronary bands in a fashion which would exacerbate any pre-existing soreness. This USDA veterinarian also indicated that any soreness or inflammation which might result from ring accident such as the horse twisting its foreleg would not show up on the thermogram for at least a day. If this is true, and we have been provided with no reason to doubt its veracity, it is in direct contradiction to the appellants' assertions.

The appellants' witness also asserted that the thermograph is still an experimental device for which testing has not yet been completed and its use is not uniformly accepted. However, this veterinarian also stated that he does not own a thermograph and has never used one. His ultimate conclusion that the device is not a diagnostic tool *as such* but rather only an "aid" in diagnosis directly supports the USDA's use of the thermograph in these cases as *additional* evidentiary support for the findings of its veterinarians.

The second flaw in appellant's argument here is that without demonstrating some sort of inherent, undetectable unreliability in post-show examination evidence, any deficiencies in such evidence really only concern the weight that such evidence should be given by the original fact finder in the hearing on soreness. The appellants have had ample opportunity to uncover weaknesses in the post-show evidence utilized by the USDA and to demonstrate these flaws to the ALJ. The record of the hearing reveals that the appellants did just that by formulating their own evaluations of the horses' conditions and offering alternative explanations for any soreness found. They challenged the examining veterinarians who had made the determinations of soreness and questioned the bases for those evaluations. The ALJ considered *all* of this evidence and credited the post-show evidence as trustworthy. Under these circumstances there simply is no claim to be made on the basis of due process. The appellants' arguments, reduced to essentials, are merely disagreement with the evidentiary findings of the ALJ.[11]

Finally, the most serious flaw in the appellants' position is that they are apparently unable to provide anything other than an abstract argument that ring performance could have altered the results of the subsequent post-show examination. Indeed, the examining veterinarians testified that neither ring accident nor stress from performance could have caused the soreness they found. There was also testimony that the thermograph device only reveals inflammation which pre-existed performance and that testing in these cases showed inflammation indicative of repeated abuse in the locations typically used for soring a Tennessee Walking Horse. Nor would variations caused by performance explain why each horse was independently singled out for post-show examination on the basis of an appearance of pain *while* in the ring. Without some indication as to what actually happened during their horses' performances to render the post-show exam unreliable the appellants' challenge must be rejected.[12]

11. The appellants also argue as a part of their reliability argument, that only pre-show examinations should be used in determining soreness. This is part and parcel of their contention that post-show evidence is so unreliable as to violate due process but further asserts that the pre-show exam is of such greater reliability that due process requires reliance on it alone. We are not convinced that due process requires such a result unless it is first shown that the post-show exam is in fact inherently unreliable in ways that cannot be measured by the ALJ in evaluating the evidence. There are a number of variables which literally demand the use of the post-show examination procedure. First, the use of action devices such as chains may cause the prohibited soreness during performance. Such injury, prohibited by the Act, cannot be uncovered in a pre-show exam. Second, use of a quick acting anesthetic prior to the pre-show exam may mask otherwise existing soreness until the horse is ready for actual showing. While there is no evidence that this practice was employed in the present case, its potential use is justification for utilizing post as well as pre-show examination. Third, the present regulations require that all horses to be shown must go through the pre-show screening. Because of the number of horses involved the pre-show exam is necessarily short and cursory. There are obvious cost advantages to everyone involved in selecting only horses that exhibit signs of pain during performance for a thorough post-show examination. Moreover, the pre-show exam is not always conducted by a veterinarian and always involves local personnel who must deal with the interested parties on a daily basis. Such personnel may be reluctant to disqualify a horse from being shown—especially since their decision is virtually unreviewable. For these reasons we find unpersuasive the appellants' suggestion that the pre-show examination must, as a matter of due process, be determinative on the USDA.

12. The appellants did present some alternative explanations for their horses' sored conditions. Appellant Preach Fleming argued that his horse

### 4. Presumption of Soreness

 The appellants argue that the penalties involved in this case render the Act criminal in nature. They do so in order to attack a statutory presumption created in 15 U.S.C. § 1825(d)(5) that a horse is sore if "it manifests abnormal sensitivity or inflammation in both of its forelimbs or both of its hindlimbs." It is clear from the record, however, that neither the USDA, ALJ or USDA Judicial Officer relied upon the challenged presumption. Rather, liability was founded exclusively upon direct evidence that the horses involved met the statutory definition of sore. It is fundamental that one cannot attack application of a regulation on ground that it is unconstitutional as applied to others. *United States v. Raines,* 362 U.S. 17, 21, 80 S.Ct. 519, 522–523, 4 L.Ed.2d 524 (1960). There is, therefore, no basis upon which the appellants may here challenge the statute's presumption of soreness.

### B. Substantial Evidence

Review of the USDA's administrative decision under the Horse Protection Act is limited to determining whether the proper legal standards were employed and substantial evidence supports the decision. 15 U.S.C. § 1825(b)(2). Substantial evidence consists of that evidence adequate for a reasonable fact finder to reach that conclusion. *See Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971); *Steadman v. SEC,* 450 U.S. 91, 101 S.Ct. 999, 67 L.Ed.2d 69 (1981). The evidence of soring in each of the present cases is substantial. The examining veterinarians independently concluded that each horse was the victim of probable repeated abuse causing extreme sensitivity in the same locations on both forelegs. There were physical signs of such abuse including

scars and lesions indicative of the use of chemical agents and mechanical devices. Palpation of the horses' forelegs revealed great and abnormal sensitivity to touch. The horses all acted as if in pain and discomfort. Finally, thermograph tests on each horse showed inflamed tissue indicative of soring in both forelegs.

The orders of the USDA Judicial Officer are affirmed.

---

slipped to one "knee" during its performance and Joe Fleming stated that his horse had suffered a flare-up of tendonitis. Rowland and Meadows suggested that their horse had been "quicked" in one hoof by improper shoeing. None of these explanations, however, contradict the USDA proofs. Neither quicking in one hoof or a slip to one knee, for example, explains why both of the horse's legs were

abused, inflamed and sensitive to touch in an equal degree in the same locations. Tendonitis, the examining veterinarians testified, would not cause the soreness they found. There was also evidence that tendonitis would not explain the variations in thermo patterns found on the horse. The ALJ fully considered these arguments and weighed the evidence accordingly.