KENTUCKY DIVISION, HORSEMEN'S BENEVOLENT & PROTECTIVE ASSOCIATION, INC., Plaintiff–Appellant,

Kentucky Thoroughbred Association, Inc., Intervening Plaintiff,

v.

TURFWAY PARK RACING ASSOCIATION, INC.; Rockingham Venture, Inc.; Douglas Racing Corporation, d/b/a Ak–Sar–Ben; Bensalem Racing Association, d/b/a Philadelphia Park; and Dakota Race Management, Defendants–Appellees.

No. 93–6425.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 28, 1994.

Decided April 6, 1994.

**1408**

Douglas L. McSwain (argued and briefed), Don Siler Sturgill, Katherine M. Coleman, Sturgill, Turner & Truitt, Lexington, KY, for plaintiff-appellant.

Douglas N. Letter (argued and briefed), Dept. of Justice, Appellate Staff, Civ. Div., Washington, DC, for intervenor.

Charles H. Deters, Thomas W. Bosse (argued and briefed), Deters, Benzinger & Lavelle, Covington, KY, for Turfway Park Racing Ass'n, Inc.

James A. Philpott, Jr., Lexington, KY, for Rockingham Venture, Inc.

Charles H. Deters, Deters, Benzinger & Lavelle, Covington, KY, for Douglas Racing Corp., Bensalem Racing Ass'n, Dakota Race Management.

Richard E. Plymale, Patrick W. Madden (briefed), Brown, Todd & Heyburn, Lexington, KY, for amicus curiae Thoroughbred Owners and Breeders Ass'n.

Bruce H. Schneider (briefed), William A. Rome, Stroock & Stroock & Lavan, New York City, for amicus curiae Jockeys Guild, Inc.

Before: KENNEDY and GUY, Circuit Judges; and CONTIE, Senior Circuit Judge.

CONTIE, Senior Circuit Judge.

The Kentucky Division, Horsemen's Benevolent & Protective Association, Inc., appeals the district court's September 20, 1993 Opinion and Order[1] declaring the Interstate Horseracing Act of 1978, 15 U.S.C. §§ 3001–3007, unconstitutional. We reverse and remand for the following reasons.

## I.

Plaintiff-appellant Kentucky Division, Horsemen's Benevolent & Protective Association, Inc. ("KHBPA"), is a not-for-profit trade association of thoroughbred racehorse owners and trainers that race in Kentucky. Intervenor Kentucky Thoroughbred Association, Inc. ("KTA"), serves a similar function. The KHBPA and the KTA (collectively "the Horsemen") represent their members at Kentucky racetracks by, *inter alia*, negotiating racing contracts.

Defendant-appellee Turfway Park Racing Association, Inc. ("Turfway Park"), operates a thoroughbred racetrack in Kentucky. Though Turfway Park and the Horsemen attempted to negotiate the terms and conditions governing racing at Turfway Park, their most recent contract (a three-year agreement) expired on April 30, 1992 when Turfway Park refused to increase the percentage of revenues derived from interstate off-track wagering to be distributed to the Horsemen's "purses." The Horsemen, in turn, sought to strengthen their bargaining position by refusing to consent to interstate off-track wagering on races being run at Turfway Park as required by the Interstate Horseracing Act of 1978 (the "Act"), 15 U.S.C. §§ 3001–3007,[2] which governs inter-

---

**1.** *Kentucky Div., Horsemen's Benevolent & Protective Ass'n, Inc. v. Turfway Park Racing Ass'n, Inc.,* 832 F.Supp. 1097 (E.D.Ky.1993).

**2.** Congress enacted the Act "to regulate interstate commerce with respect to wagering on horseracing ... to further the horseracing and legal off-track betting industries in the United States." 15 U.S.C. § 3001(b). *See also* 15 U.S.C. § 3001(a)(3) ("The Congress finds that— in the limited area of interstate off-track wagering on horseraces, there is a need for Federal

action to ensure States will continue to cooperate with one another in the acceptance of legal interstate wagers."). To further this policy, 15 U.S.C. § 3003 provides that "[n]o person may accept an interstate off-track wager except as provided in this chapter."

The Act provides (in relevant part):
(a) An interstate off-track wager may be accepted by an off-track betting system only if consent is obtained from
 (1) the host racing association, except that—

state wagering on horseracing. Turfway Park, in retaliation, sought to obtain the required consent directly from the individual racehorse owners by inserting a paragraph in its entry form which conditioned entry in a race on the racehorse owner's consent to interstate off-track wagering. Turfway Park's races were then broadcast to several out-of-state facilities where off-track wagers were placed.

The KHBPA thereafter initiated this action seeking damages and injunctive relief against Turfway Park and several out-of-state entities[3] that had received the simulcasts and had accepted wagers on Turfway Park's races. The KHBPA, citing 15 U.S.C. §§ 3005[4] and 3006[5], claimed that Turfway Park and the other defendants had violated the Act by accepting interstate off-track wagers on Turfway Park's races without the KHBPA's consent. The KTA subsequently intervened pursuant to 15 U.S.C. § 3006(b) ("In any civil action under this section, the host State, the host racing association and

horsemen's group, if not a party, shall be permitted to intervene as a matter of right.").

Turfway Park, in turn, filed a counterclaim against the Horsemen and a third party complaint against various associations claiming, *inter alia*, that the conduct of these entities "restrain[ed] competition in the presentation of thoroughbred horseracing and wagering" in violation of the Sherman Antitrust Act, 15 U.S.C. § 1 *et seq.*, and tortiously interfered with its business relations. Turfway Park also challenged the constitutionality of the Act.

On September 20, 1993, the district court found the Act to be "an invalid restriction on commercial speech in violation of the First Amendment, as well as fatally vague and irrational ... in violation of substantive due process." 832 F.Supp. at 1098. Specifically, the district court found that:

Turfway's simulcasting of its races invites patrons of out-of-state tracks to bet on Turfway's races. Commercial transactions occur when these patrons place such bets. The simulcasts also act as an implied ad-

(A) as a condition precedent to such consent, said racing association ... must have a written agreement with the horsemen's group, under which said racing association may give such consent, setting forth the terms and conditions relating thereto; provided,
(B) [w]here written consents exist at the time of enactment of this chapter between an off-track betting system and the host racing association providing for interstate off-track wagers, or such written consents are executed by these parties prior to the expiration of such then-existing contract, upon the expiration of such then-existing contract the written agreement of such horsemen's group shall thereafter be required as such condition precedent and as a part of the regular contractual process, and may not be withdrawn or varied except in the regular contractual process. Where no such written consent exists, and where such written agreement occurs at a racing association which has a regular contractual process with such horsemen's group, said agreement by the horsemen's group may not be withdrawn or varied except in the regular contractual process;
(2) the host racing commission;
(3) the off-track racing commission.
15 U.S.C. § 3004.

3. In addition to Turfway Park, the KHBPA named the following defendants in its amended complaint: Rockingham Venture, Inc.; Douglas Racing Corporation d/b/a Ak–Sar–Ben; Bensa-

lem Racing Association, Inc., d/b/a Philadelphia Park; and, Dakota Race Management.

4. 15 U.S.C. § 3005 provides (in its entirety):
Any person accepting any interstate off-track wager in violation of this chapter shall be civilly liable for damages to the host State, the host racing association and the horsemen's group. Damages for each violation shall be based on the total of off-track wagers as follows:
(1) If the interstate off-track wager was of a type accepted at the host racing association, damages shall be in an amount equal to that portion of the takeout which would have been distributed to the host State, host racing association and the horsemen's group, as if each such interstate off-track wager had been placed at the host racing association.
(2) If such interstate off-track wager was of a type not accepted at the host racing association, the amount of damages shall be determined at the rate of takeout prevailing at the off-track betting system for that type of wager and shall be distributed according to the same formulas as in paragraph (1) above.

5. 15 U.S.C. § 3006 provides (in relevant part):
(a) The host State, the host racing association, or the horsemen's group may commence a civil action against any person alleged to be in violation of this chapter, for injunctive relief to restrain violations and for damages in accordance with section 3005 of this title.

vertisement for the quality of the track and its racing as well as an implied invitation to the viewers to patronize Turfway if they are in the Northern Kentucky/Cincinnati area. Therefore, the simulcasts constitute commercial speech, and the Act allows it to be prohibited whenever one of the designated parties withholds consent.

. . . .

This court must, albeit reluctantly, hold that the means chosen by Congress are not "narrowly tailored to achieve [the] desired objective[s]." Therefore, the Act is an invalid restriction on commercial speech.

. . . .

The statutory scheme prohibits interstate simulcasting unless the track at which the race is being run (the "host" track) has "a written agreement with the horsemen's group...." 15 U.S.C. § 3004(a)(1)(A). This seems fairly straightforward. The trouble arises when one looks to the definition of "horsemen's group": "[T]he group which represents the majority of owners and trainers racing there, for the races subject to the interstate off-track wager on any racing day." 15 U.S.C. § 3002(12). This definition may be workable in a situation where, as apparently presumed by Congress, a horsemen's association has reached an agreement with the host track in advance of the racing meet. It falls apart, however, when the unhappy scenario exists, as it does here, that there are two horsemen's groups—rivals of each other and both at loggerheads with the track—and numerous owners and trainers unaffiliated with either group....

First, the statute is self-contradictory in that § 3004(b) contemplates, as does the legislative history, that the consent of the horsemen's group will be obtained in the regular contractual process. However, § 3002 requires the identification of the relevant horsemen's group representing the majority of owners and trainers on each racing day.

Second, the statute is vague as to what it means by "owner." Some horses have many owners—some of which are partnerships, corporations or unincorporated consortia....

Third, the largest horsemen's group represents only 55% of owners eligible to race. Therefore, the possibility exists that on "any racing day" no horsemen's group will represent a majority of the owners and trainers....

Fourth, the parties have stipulated that entries to a race are usually closed 48 hours in advance. Scratches usually occur by 4 p.m. of the day prior to the race; however, emergency scratches are possible up to post time. What if a scratch changes the election result for that racing day?

Lastly, what is the meaning of "represent?" It seems like a simple word, but it has already caused the court considerable difficulty in trying to preside over this dispute. The statute gives a veto to the horsemen's group which "represents the majority of owners and trainers" on "any racing day." 15 U.S.C. § 3002(12). Does this mean owners and trainers who merely belong to a horsemen's group? Or can Turfway, as it has tried to do by various means, solicit proxies or consents [directly] from a horsemen's group's members....

The difficulties listed are not speculative. The parties have already argued in open court about who is "represented" by the horsemen's associations who are the plaintiffs in this matter. Turfway has already solicited owners and trainers for individual consents to simulcasting. It has also attempted to insert in its race entries and stall applications consents to simulcasting, as a kind of contract of adhesion.

. . . .

The above list of ambiguities in the statute shows that neither the court nor the parties have any way of knowing how the statute should be applied in the context of an ongoing dispute between Turfway and the Horsemen, which is essentially an acrimonious strike. The statute does not inform ordinary people (or even experts) what conduct is required or prohibited although they are exposed to heavy penalties for violating it. In the present context it leads to continuing litigation and, since its enforcement has been given over to private parties, to arbitrary enforcement. Fur-

thermore, the statutes are not designed for application in a situation where a track does not have an agreement with a horsemen's group in advance of the meet. The statute is impossible to apply with certainty on a day-to-day basis in the context of an ongoing dispute. To try to make it more definite by interpretation is pure guesswork. Accordingly, the court must hold that it is void for vagueness.

Substantive due process requires that a statute have a rational relationship to a legitimate legislative goal....

....

Here, Congress' announced goal is the promotion of horseracing, especially the preservation of small tracks, while protecting the interests of horsemen and the public. Providing a private party with an absolute veto over the simulcasting, without any standards to guide it, virtually assures that the statute will be applied, not to achieve Congress' goal, but for selfish motives. The conduct of the parties in this matter amply demonstrates that they favor selfish interests over public ones. Furthermore, there is no review of the Horsemen's reasons for exercising their veto power. Indeed, there is no requirement in the Act that the Horsemen exercise their veto power to promote Congress' goal rather than their own short-term economic interest, which may be contrary to Congress' objectives.

....

Because the Act is vague and an irrational means of carrying out a permissible objective, the statute must be declared unconstitutional on substantive due process grounds as well.

832 F.Supp. at 1100–05 (brackets in original).

After finding the Act unconstitutional, the district court granted Turfway Park's motion for partial summary judgment without expressing an opinion on the other issues raised in KHBPA's claim or in Turfway Park's counterclaim and third party complaint. The KHBPA timely appealed.

## II.

### Standard of Review

Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A district court's grant of summary judgment is reviewed *de novo*. *Pinney Dock & Transp. Co. v. Penn Cent. Corp.*, 838 F.2d 1445, 1472 (6th Cir.), *cert. denied*, 488 U.S. 880, 109 S.Ct. 196, 102 L.Ed.2d 166 (1988). In its review, this court must view the facts and all inferences drawn therefrom in the light most favorable to the nonmoving party. *60 Ivy St. Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir.1987).

The moving party has the burden of conclusively establishing that no genuine issue of material fact exists. *Id.* Nevertheless, in the face of a summary judgment motion, the nonmoving party cannot rest on its pleadings but must come forward with some probative evidence to support its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

"By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (emphasis in original). The dispute must be genuine and the facts must be such that if they were proven at trial, a reasonable jury could return a verdict for the nonmoving party. *60 Ivy St. Corp.*, 822 F.2d at 1435. If the disputed evidence "is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2511 (citations omitted).

### First Amendment Claim

In its complaint, the KHBPA claimed that Turfway Park: "failed to meet the condition precedent set out in 15 U.S.C. § 3004(a)(1), as host racing association, so as to give its valid, legal consent to interstate

off-track wagering in accordance with the Interstate Horseracing Act of 1978"; "acted in violation of the Interstate Horseracing Act, 15 U.S.C. § 3003, by transmitting interstate off-track telecasts for wagering purposes"; and, "violated the Interstate Horseracing Act, 15 U.S.C. § 3003, by failing to obtain the appropriate consent of the host racing commission, pursuant to 15 U.S.C. § 3004(a)(2)." KHBPA's March 31, 1993 First Amended and Restated Complaint at 4–5. KHBPA requested damages and injunctive relief "to prevent Defendant Turfway from ever again transmitting interstate horseracing signals for the purpose of interstate off-track wagering without the [KHBPA's] consent." *Id.* at 7. The district court entered a modified preliminary injunction allowing interstate simulcasting and off-track wagering provided that all interstate simulcasting revenues be placed in an escrow account pending resolution of the action.

Because the Horsemen sought an injunction prohibiting further "simulcasting for wagering purposes," the district court subjected the Act to First Amendment scrutiny. Though the district court found that the Act unlawfully restricts commercial speech, we conclude that the Act does not regulate commercial speech. Contrary to the district court's findings, the Act regulates interstate wagering, not simulcasting. In fact, the Act does not even mention simulcasting.

In its first regulatory provision, the Act provides that "[n]o person may accept an interstate off-track wager except as provided in this Act." 15 U.S.C. § 3003. The Act allows interstate off-track wagering if, and

only if, specified groups consent: the "host racing association" [6]; the "horsemen's group" [7]; the "host racing commission" [8]; and, the "off-track racing commission." [9]

The Act warns that any person who accepts an interstate off-track wager in violation of the Act "shall be civilly liable for damages to the host State, the host racing association and the horsemen's group," 15 U.S.C. § 3005, and provides that "[t]he host State, the host racing association, or the horsemen's group may commence a civil action against any person alleged to be in violation of [the Act] for injunctive relief to restrain violations and for damages...." 15 U.S.C. § 3006(a).

Because the Act does not implicate the First Amendment by regulating interstate horserace wagering,[10] *see United States v. Edge Broadcasting Co.*, —— U.S. ——, ——, 113 S.Ct. 2696, 2703, 125 L.Ed.2d 345 (1993) ("the activity underlying the relevant advertising—gambling—implicates no constitutionally protected right; rather, it falls into a category of 'vice' activity that could be, and frequently has been, banned altogether"), we reverse the district court's decision invalidating the Act as violative of the First Amendment.

### Substantive Due Process Claim

#### A. Vagueness

In *Grayned v. City of Rockford*, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972), the

---

6. The Act defines "host racing association" as "any person who, pursuant to a license or other permission granted by the host State, conducts the horserace subject to the interstate wager." 15 U.S.C. § 3002(9).

7. The Act defines "horsemen's group" as "the group which represents the majority of owners and trainers racing [at the applicable host racing association] for the races subject to the interstate off-track wager on any racing day." 15 U.S.C. § 3002(12).

8. The Act defines the "host racing commission" as "that person designated by State statute or, in the absence of statute, by regulation, with jurisdiction to regulate the conduct of racing within the host State." 15 U.S.C. § 3002(10).

9. The Act defines the "off-track racing commission" as "that person designated by State statute or, in the absence of statute, by regulation, with jurisdiction to regulate off-track betting in that State." 15 U.S.C. § 3002(11).

10. We reject the appellees' claim that Congress was implicitly regulating the simulcasting of horseraces by regulating interstate off-track wagering because interstate off-track wagering may occur without simulcasting, and simulcasting may occur without interstate off-track wagering. Accordingly, because simulcasting and off-track wagering are not inextricably linked, it is irrelevant to our decision that races conducted at Turfway Park are simulcast across state lines.

Supreme Court enunciated the standards for evaluating vagueness:

> Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory applications.

*Id.* at 108–09, 92 S.Ct. at 2298–99 (footnotes omitted). *See also United States v. Petrillo,* 332 U.S. 1, 7, 67 S.Ct. 1538, 1542, 91 L.Ed. 1877 (1947) (a statute must "mark boundaries sufficiently distinct for judges and juries fairly to administer the law in accordance with the will of Congress").

The degree of vagueness that the Constitution tolerates "depends in part on the nature of the enactment." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 498, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982). In fact, the Supreme Court has "expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." *Id.* at 498–99, 102 S.Ct. at 1193 (footnote omitted). Economic legislation, in particular, "is subject to a less strict vagueness test because its subject matter is often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action." *Id.* at 498, 102 S.Ct. at 1193 (footnotes omitted).

Though the language used in the Interstate Horseracing Act of 1978 is imprecise and subject to interpretation,[11] the Act constitutes economic legislation regulating a very narrow subject matter. Accordingly, we must apply a "less strict vagueness test" to the Act's provisions. *See generally Fleming v. United States Dep't of Agric.,* 713 F.2d 179, 185 (6th Cir.1983) (When the entities affected by a statute "are a select group with specialized understanding of the subject being regulated the degree of definiteness required to satisfy due process concerns is measured by the common understanding and commercial knowledge of the group.").

Though the district court properly noted imprecision in the Act, "[t]he strong presumptive validity that attaches to an Act of Congress has led this Court to hold many times that statutes are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language." *United States v. National Dairy Prods. Corp.,* 372 U.S. 29, 32, 83 S.Ct. 594, 597, 9 L.Ed.2d 561 (1963). In fact, " '[i]t is our duty in the interpretation of federal statutes to reach a conclusion which will avoid serious doubt of their constitutionality.' " *United States v. Rumely,* 345 U.S. 41, 45, 73 S.Ct. 543, 545, 97 L.Ed. 770 (1953) (brackets in original) (quoting *Richmond Screw Anchor Co. v. United States,* 275 U.S. 331, 346, 48 S.Ct. 194, 198, 72 L.Ed. 303 (1928)).

The district court found the Act unconstitutionally vague because the court had difficulty reconciling the Act's provisions. The Act's legislative history reveals that Congress intended to preserve the traditional relationships that existed in the horseracing industry (between the track and horsemen) by limiting the emerging interstate off-track wagering industry. Accordingly, one permissible interpretation of the Act suggests that a racetrack obtain the horsemen's consent during regular contract negotiations with the trade association that the horsemen choose

---

11. For example, 15 U.S.C. § 3004 directs the host racetrack to obtain consent to off-track wagering from the "horsemen's group" during the "regular contractual process," and 15 U.S.C. § 3002(12) defines a "horsemen's group" as the group representing "the majority of owners and

trainers ... on any racing day." The district court found these two provisions contradictory because the horsemen's group involved in the regular contractual process with the racetrack may not represent the majority of horsemen racing on a given day.

to represent them; if a racetrack did not previously negotiate with a representative trade association, the racetrack would be required to obtain the consent directly from the owners.

A racetrack that routinely negotiates racing contracts with horsemen's associations may not abandon this practice when contract negotiations stall because: Congress intended to preserve the traditional relationships between the parties in the horseracing industry; Congress intended that the horsemen play a significant role in limiting off-track wagering; and, it would severely curtail the horsemen's ability to protect their own interests. Accordingly, we reverse the district court's vagueness determination.

### B. Rationality

The Act regulates interstate horserace wagering by balancing the interests of the horseracing industry against those of the interstate off-track wagering industry. Because "legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality," *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976), "judgments about the wisdom of such legislation remain within the exclusive province of the legislative and executive branches," *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 729, 104 S.Ct. 2709, 2718, 81 L.Ed.2d 601 (1984), if the "statute is supported by a legitimate legislative purpose furthered by rational means." *Id.* In fact, Congress has "absolutely no obligation to select the scheme that a court later would find to be the fairest, but simply one that was rational and not arbitrary." *National R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co.,* 470 U.S. 451, 477, 105 S.Ct. 1441, 1458, 84 L.Ed.2d 432 (1985).

Though the Supreme Court has "never insisted that a legislative body articulate its reasons for enacting a statute," *United States R.R. Retirement Bd. v. Fritz,* 449 U.S. 166, 179, 101 S.Ct. 453, 461, 66 L.Ed.2d 368 (1980), Congress noted that it enacted

the Act to further both the horseracing and interstate off-track wagering industries, 15 U.S.C. § 3001(b), and to ensure that each state be empowered to control the gambling within its own borders. 15 U.S.C. § 3001(a). Given the size and impact of the horseracing and off-track betting industries on interstate commerce, Congress clearly has the power to regulate these industries. *See, e.g., Champion v. Ames,* 188 U.S. 321, 23 S.Ct. 321, 47 L.Ed. 492 (1903) (Congress may exercise its Commerce Clause powers to regulate interstate gambling). Though the district court agreed that there were legitimate goals underlying the Act, the court found that the Act's self-regulatory scheme was not rationally related to achieving the desired ends.

When Congress enacted the Act, off-track wagering was already in place as a legal alternative to betting at the track where the race was being run. Congress recognized that the unrestricted proliferation of off-track wagering would hurt the horseracing industry by decreasing attendance at racetracks which, in turn, would reduce the number of horses needed to compete and the number of individuals employed in the industry. Moreover, unrestricted off-track wagering threatened the viability of small racetracks which provide a marketplace for horses of lesser quality and aspiring jockeys.

Though the bills first introduced in Congress sought to eliminate interstate off-track wagering in its entirety, Congress soon recognized that horseracing and off-track wagering could coexist if regulated. Congress therefore opted for the compromise found at 15 U.S.C. § 3004(a) which allows interstate off-track wagering if, and only if, the interested parties consent.

Under the Act, each state may prohibit interstate off-track wagering within its borders, and may prohibit a resident racetrack from contracting with an off-track wagering facility in another state. Though the district court found the Act irrational (and therefore unconstitutional) because the horsemen may withhold their consent to further their own "selfish motives," [12] the horsemen's veto dif-

---

**12.** The district court held (in relevant part):

Providing a private party with an absolute veto

fers little from the racetrack owner's veto—both the horsemen and the racetrack owner may reduce off-track wagering revenue without government intervention. Though the horsemen's veto could frustrate Congress' goal of furthering the growth of the off-track wagering industry, the horsemen have a vested interest in the added revenue that off-track wagering provides. Though appealing to the horsemen's self-interest may not be the best or most logical method for promoting the horseracing and interstate off-track wagering industries, it is not irrational to believe that the horsemen would refrain from using their veto power to destroy an industry that provides them with additional revenues. *See Williamson v. Lee Optical of Oklahoma, Inc.*, 348 U.S. 483, 487–88, 75 S.Ct. 461, 464, 99 L.Ed. 563 (1955) ("the law need not be in every respect logically consistent with its aims to be constitutional").

The horsemen's veto is also rationally related to the horseracing industry's desire to avoid the harmful effects of unrestricted interstate off-track wagering. Whereas individual racetracks benefit by contracting with numerous off-track wagering facilities, the horsemen have a strong interest in limiting off-track betting to ensure continued demand for their services. Accordingly, the horsemen's veto affords the horsemen an important means of protecting the entire sport of horseracing. Without the veto power, the horsemen's ability to protect their interests would be severely impaired.

We conclude that the Act is rationally related to advancing Congress' legitimate federal interests notwithstanding the horsemen's veto power. The horsemen, more than any other affected group, have a substantial interest in maintaining the balance that Congress sought to achieve—the horsemen want the additional money that off-track wagering provides while preserving the horseracing

over the simulcasting without any standards to guide it, virtually assures that the statute will be applied, not to achieve Congress' goal, but for selfish motives. The conduct of the parties in this matter amply demonstrates that they favor selfish interests over public ones. Furthermore, there is no review of the Horsemen's reasons for exercising their veto power. Indeed, there is no requirement in the Act that the Horsemen exercise their veto power to

industry. It is this interest that will prevent the horse owners from using their consent power in an arbitrary or capricious manner. We therefore reverse the district court's substantive due process determination. We now consider several of the appellees' other constitutional arguments.[13]

### Tenth Amendment Claim

The appellees argue that the Act compels the States to regulate off-track betting, in violation of the Tenth Amendment as interpreted in *New York v. United States*, — U.S. —, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992). In *New York*, the Supreme Court held that "the Constitution simply does not give Congress the authority to require the States to regulate." *Id.* at —, 112 S.Ct. at 2429. The appellees maintain that the Act forces the States to regulate because, "[w]hen faced with a facility's request to participate in interstate wagering," a State "must exercise [its] regulatory responsibilities to approve or disapprove the request." Appellees' Brief at 15.

The Act, however, does not require a State to do *anything* when presented with a request for its consent to off-track betting. Under the Act, the State remains free to ignore such a request. It is true that the State's inaction will preserve the general federal prohibition of interstate off-track betting set forth in 15 U.S.C. § 3003, but that effect does not amount to "regulation" as that term was used by the Court in *New York*. The *New York* Court adhered to the common-sense view that "regulation" is an affirmative act by the State. *See New York v. United States*, — U.S. at —, 112 S.Ct. at 2420 ("this Court never has sanctioned explicitly a federal command to the States to promulgate and enforce laws and regulations"), 2429 ("no Member of the Court has ever suggested

promote Congress' goal rather than their own short-term economic interest, which may be contrary to Congress' objectives.
*Kentucky Div., Horsemen's Benevolent & Protective Ass'n, Inc.*, 832 F.Supp. at 1105.

**13.** Though the district court found it unnecessary to consider these arguments, they were extensively briefed by the parties to this appeal.

that such a federal interest would enable Congress to command a state government to enact *state* regulation"), 2430 (no "constitutional provision authorizes Congress to command state legislatures to legislate."). Indeed, a contrary conception of "regulation" would yield absurd results. The Act merely gives the States a limited power to preempt the general federal prohibition of interstate off-track wagering. If the provision of that power forces the States to regulate, so too is the federal government forced to regulate whenever a State passes a law that may be preempted by Congress. The appellees' argument is without merit.

### Unlawful Delegation Claims

The appellees next argue that the Act unconstitutionally delegates power to private parties, by means of the "horsemen's veto." The appellees assert that this veto allows a group such as the Horsemen to determine "what the law will be," because such a group can determine whether interstate off-track betting on races involving their horses will be prohibited. The appellees rely primarily upon *Eubank v. City of Richmond,* 226 U.S. 137, 33 S.Ct. 76, 57 L.Ed. 156 (1912). In *Eubank,* the Court "invalidated a city ordinance which conferred the power to establish building setback lines upon the owners of two-thirds of the property abutting any street." *City of Eastlake v. Forest City Enter., Inc.,* 426 U.S. 668, 677, 96 S.Ct. 2358, 2364, 49 L.Ed.2d 132 (1976). The appellees also cite *Washington ex rel. Seattle Title & Trust Co. v. Roberge,* 278 U.S. 116, 49 S.Ct. 50, 73 L.Ed. 210 (1928), in which the Court "struck down an ordinance which permitted the establishment of philanthropic homes for the aged in residential areas, but only upon the written consent of the owners of two-thirds of the property within 400 feet of the proposed facility." *Eastlake,* 426 U.S. at 677, 96 S.Ct. at 2364.

The constitutionality of the horsemen's veto, however, is governed by Supreme Court precedent other than *Eubank* and *Roberge.* In *Thomas Cusack Co. v. City of Chicago,* 242 U.S. 526, 37 S.Ct. 190, 61 L.Ed. 472 (1917), the Court upheld a provision that waived, upon the consent of one-half of the

affected property owners, a municipal prohibition on the erection of billboards. The Court easily distinguished this provision from that at issue in *Eubank:*

> The [*Eubank*] ordinance permits two-thirds of the lot owners to impose restrictions upon the other property in the block, while the [billboard provision] permits one-half of the lot owners to remove a restriction from the other property owners. This is not a delegation of legislative power, but is ... a familiar provision affecting the enforcement of laws and ordinances.

*Thomas Cusack,* 242 U.S. at 531, 37 S.Ct. at 192. Similarly, in *Currin v. Wallace,* 306 U.S. 1, 59 S.Ct. 379, 83 L.Ed. 441 (1939), the Court upheld a provision that made the effect of certain tobacco regulations contingent upon the approval of two-thirds of the tobacco growers voting in a prescribed referendum. The Court concluded that the referendum provision "does not involve any delegation of legislative authority[,]" because

> Congress has merely placed a restriction upon its own regulation by withholding its operation as to a given market "unless two-thirds of the growers voting favor it." ... This is not a case where a group of producers may make the law and force it upon a minority or where a prohibition of an inoffensive and legitimate use of property is imposed not by the legislature but by other property owners. Here it is Congress that exercises its legislative authority in making the regulation and in prescribing the conditions of its application.

*Id.* at 15–16, 59 S.Ct. at 387 (citations omitted).

 Like the provisions at issue in *Thomas Cusack* and *Currin,* the horsemen's veto provision does not allow a private party to "make the law and force it upon a minority"; rather, the veto is merely a condition established by Congress upon the application of Congress' general prohibition of interstate off-track betting. Thus, the Act merely affords the Horsemen a limited power to waive a restriction created by Congress, just as the ordinance in *Thomas Cusack* provided one-half of the property owners with the power to waive the billboard restriction. And since the property owners in *Thomas Cusack* were

not empowered to "make the law and force it upon" others by the fact that the billboard prohibition remained in effect if they chose not to exercise their waiver power, neither are the Horsemen so empowered by the fact that Congress' restriction remains in effect if they choose not to exercise their limited waiver power. The Act therefore does not delegate legislative power to private parties.

 The appellees further argue that the Act delegates legislative power to the States without intelligible standards to guide the exercise of that power, in violation of the "nondelegation doctrine" described in *Mistretta v. United States*, 488 U.S. 361, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989).[14] This argument overlooks the foundation upon which the nondelegation doctrine rests. The Supreme Court has repeatedly explained that "[t]he nondelegation doctrine is rooted in the principle of separation of powers that underlies our tripartite system of Government." *Id.* at 371, 109 S.Ct. at 654. The nondelegation doctrine thus ensures that Congress does not delegate its legislative power to either of the "coordinate Branches," although it does permit Congress to obtain the "assistance" of those Branches. *Id.* at 372, 109 S.Ct. at 654–55. When Congress affords the States the option of regulating a particular activity, however, there is no danger that the federal legislative power will be exercised by the executive or judicial Branches of the federal government; instead, if the State accepts the invitation extended to it by Congress, the federal legislative power is not exercised at all. Thus, the separation of powers principle and, *a fortiori*, the nondelegation doctrine, simply are not implicated by Congress' "delegation" of power to the States. Rather than violate the separation of powers principle, such a delegation in fact furthers another core constitutional value—that of federalism. Hence, without regard to whether the Act effects a "delegation" of legislative power to the States, the appellees' argument is meritless.

### Subject Matter Jurisdiction

 Turfway Park argues that the district court lacked subject matter jurisdiction over this action because the Act creates civil liability for those who accept interstate wagers in contravention of the Act, not those who merely simulcast the races that are the subject of such wagers.[15] Because off-track wagers are placed in the host racetrack's pari-mutuel pool when the track enters into an agreement to simulcast races to an off-track facility, we conclude that Turfway Park accepted an interstate off-track wager for purposes of the Act.[16]

### III.

We REVERSE the district court's September 14, 1993 Opinion and Order finding the Interstate Horseracing Act of 1978 unconstitutional and REMAND this action to the district court to resolve the issues that remain.

---

**14.** Appellees also argue that the Act delegates legislative power to private parties without intelligible standards to guide the exercise of that power, but, as just explained, the Act does not delegate any legislative power to private parties.

**15.** The Act provides that "[a]ny person accepting any interstate off-track wager in violation of this chapter shall be civilly liable for damages to the host State, the host racing association and the horsemen's group." 15 U.S.C. § 3005.

**16.** Kentucky law statutorily apportions wagers received by an out-of-state off-track betting facility: 22% to the host track; 22% to the purse program at the host track; 22% to the betting facility; 22% to the purse program at the betting facility; and, the remaining 12% is allocated evenly between the track and betting facility to cover the cost of simulcasting. Ky.Rev.Stat. § 230.378(3). The statutory apportionment may be modified by contract as it was by the 1989 contract between the KHBPA and Turfway Park.